784 A.2d 734 (2001)
345 N.J. Super. 207
Margaret VASSALLO and Philip Vassallo, her husband, Plaintiffs-Appellants,
v.
AMERICAN CODING & MARKING INK CO. and Natmar Services Corp., Defendants-Respondents, and
Graphco, Inc. and State of New Jersey, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued September 17, 2001.
Decided November 20, 2001.
*736 Lawrence R. Cohan, Philadelphia, PA, argued the cause for appellants (Anapol, Schwartz, Weiss, Cohan, Feldman & Smalley, attorneys; Patrice A. Gillotti, on the brief).
Stephen R. McDonnell, Philadelphia, PA, argued the cause for respondent American Coding & Marking Ink Co. (Delaney & O'Brien, attorneys; David P. Bateman and Mr. McDonnell, on the brief).
Thomas J. Kelly, Jr., Union, argued the cause for respondent Natmar Services Corp. (Hurley, Vasios, Kelly & Strollo, attorneys; Mr. Kelly, on the brief).
Before Judges HAVEY, BRAITHWAITE and COBURN.
*735 The opinion of the court was delivered by HAVEY, P.J.A.D.
This is a failure-to-warn, product liability case. Plaintiff Margaret Vassallo[1] alleges that, while working as a sewing worker at the State of New Jersey's Woodbine Development Center, she was exposed to a product called "Resisto marking ink," produced by defendant American Code and Marking Ink, Inc., and distributed by defendant Natmar Services Corporation. She claims that the exposure to the ink caused her to suffer severe personal injuries, including pulmonary, cerebral, cardiovascular and psychiatric disorders. The trial court granted defendants summary judgment, concluding that plaintiff's experts' reports failed to present a causation nexus between plaintiff's exposure to the product and her conditions. The court also denied plaintiff's motion for reconsideration. We reverse and remand for an N.J.R.E. 104 hearing.
Considering the evidence in a light most favorable to plaintiff, Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 666 A.2d 146 (1995), these are the facts. In October 1988, while working at the State's Woodbine Development Center, plaintiff was exposed to Dursban, a pesticide. She experienced dizziness, headaches, nausea, congestion, sore throat, chest tightness, cough, and eye irritation. Plaintiff was diagnosed with an upper respiratory tract infection and was treated with antibiotics. However, her condition worsened. In 1989 through 1990, plaintiff was evaluated and treated by a series of physicians and psychiatrists. In February 1990, she was evaluated by Dr. Elissa Ann Favato, an internist specializing in occupational disease. Dr. Favato concluded that plaintiff's symptoms were related to her exposure to Dursban, and that she suffered from multiple chemical sensitivity disorder (MCSD), an acquired disorder characterized by oversensitivity to "unrelated" chemical compounds "at doses far below *737 those established in the general population to cause harmful effects." Dr. Favato recommended that plaintiff work in a chemically-free environment.
In May 1990, plaintiff was transferred to the State's North Princeton Development Center in Skillman, where she worked as a sewing worker. Part of her work involved marking clothing with labels using a heat seal machine and an ink marking device. That procedure involved the use of a labeling machine pressed onto ink pads. Plaintiff manually re-inked the pad with Resisto marking ink by using a small plastic applicator with a nozzle. She would thereupon use a heat sealing device to permanently label the clothing. According to plaintiff, she spent approximately twenty-five percent of her time marking clothing by use of the ink device and heater.
In the summer of 1993, plaintiff began suffering from dizzy spells and chest pains while employing the inking device. Her eyes started to burn, and the burning sensation would abate when she was at home. During the period she worked at Skillman, the ventilation system failed on two occasions, and the ink marking machine malfunctioned. As a result, ink would often spill onto her hands. By June 1995, plaintiff began experiencing episodes of chronic sore throat, laryngitis, diarrhea, continued chest pains and burning sensation in her eyes.
On September 19, 1995, on the advice of a physician, plaintiff terminated her employment with the State. She was thereafter examined by a psychiatrist, a gastroenterologist, and a cardiologist, as well as other physicians. The cardiologist concluded that plaintiff suffered from chest wall pains due to panic attacks. Her chest pain and burning sensation in her eyes continued. She began experiencing episodes of chronic sore throat, laryngitis, and diarrhea.
On April 6, 1996, Dr. Miklos Boczko, a neurologist, examined plaintiff and diagnosed early cerebellar, particularly midline, degeneration, "directly and causally related to chemical exposure, including chronic encephalopathy." In making his diagnosis, Dr. Boczko notes as significant plaintiff's work exposure to pesticides and "ink," which contained diethylaminoethanol and formaldehyde.
Dr. Susan Daum, an internist specializing in environmental and occupational medicine, examined plaintiff on January 22, 1996. In her report, Dr. Daum noted plaintiff's exposure to Dursban in 1988. She also noted plaintiff's use, from 1990 through 1995, of the Resisto marking ink product, which Dr. Daum found significant. Dr. Daum stated that according to the Resisto's material safety data sheet (MSDS), the product becomes more caustic when heated. Dr. Daum noted that plaintiff's symptoms worsened during the period she was exposed to the ink and other caustic materials. She concluded that Plaintiff suffered from MCSD, "aggravated by exposure to ... formaldehyde, diethylaminoethanol or its breakdown products."
Dr. G. John DiGregorio, a professor of pharmacology, interviewed plaintiff, reviewed her medical records and, on November 26, 1996, concluded that "[i]t is obvious that her symptoms are related to her exposure to the solvents associated with the ink such [as] formaldehyde. Her disabilities are definitely related to her job and her exposure."
Dr. Allan Lieberman, board certified in environmental medicine, rendered three reports dated June 27, 1996, August 29, 1996, and November 16, 1998. After examining plaintiff and reviewing her medical records, Dr. Lieberman concluded that her constant imbalance, chronic pain in the *738 chest wall, breathing difficulties, headaches, cough, diarrhea and dizziness were caused by exposures to "glue, formaldehyde, and pesticides." He specifically identified Resisto marking ink, "containing diethylaminoethanol and formaldehyde" as one of the offending caustic agents. His medical diagnosis was a history of acute and chronic chemical exposures, including organophosphate pesticides in 1988, and "glues, inks, diethylaminoethanol, formaldehyde and organophosphate pesticides in the workplace" from 1990 through 1995. (Emphasis added).
In granting summary judgment to defendants, the trial court found that the expert reports submitted by plaintiffs did not address what "needed to be addressed," that is, the effect of the toxic substances in the ink, and how exposures to those toxic substances were causally related to plaintiff's medical condition. The court observed that the reports in fact focused predominately on plaintiff's exposure to the pesticide Dursban in 1988, and that "[n]one of the reports indicate that the present symptoms that [plaintiff] has... were directly related in any way or caused by the ink as opposed to other causative forces."
Plaintiffs moved for reconsideration. In support of the motion they submitted a second report from Dr. DiGregorio dated November 26, 1999. In the report, the doctor notes that he had examined Resisto's MSDS and twenty-one medical reports and records of plaintiff's treatment. Dr. DiGregorio again notes that starting in 1990, plaintiff "came in frequent contact with the use of Resisto Marking Ink." He concludes that the exposure "aggravated a preexisting situation and was a major contributing factor for her persistent neurological and pulmonary problems. Both diethylaminoethanol and formaldehyde can affect the pulmonary system and the central nervous system."
An affidavit of Dr. Lieberman dated October 4, 1999, was also produced. Dr. Lieberman "clarif[ied]" his prior opinions by noting plaintiff's exposure to Dursban in 1988, and that based on his review of the medical records and physical and medical evaluation of plaintiff, her acute symptoms related to her exposure to Dursban "had essentially resolved, although she was left in a more sensitized condition." (Emphasis added). He added that plaintiff's chronic conditions suffered were "entirely consistent with the known hazards associated with Resisto Marking Ink" as demonstrated by the product's MSDS. Knowing that plaintiff had been exposed to multiple caustic agents during her employment, Dr. Lieberman nevertheless found that "it has always been my opinion that her occupational exposure to Resisto Marking Ink substantially contributed to and/or aggravated her physical problems as enumerated above and in my August 29, 1996 report." In denying the motion for reconsideration the trial court stood by its view that plaintiff had not provided "causation reports." As to Drs. DiGregorio's and Lieberman's supplemental opinions submitted after the summary judgment order, the court was of the view that:
It's too little. It's too late. The reports aren't sufficient, I don't think, to carry the day even if they existed as they exist now. I think you'd still need more in terms of liability reports. This might give you enough to give you causation maybe if we held [an N.J.R.E. 403] hearing, but I don't think it has there's no analysis of the work place by anyone.
The gravamen of plaintiff's case is that defendants failed to warn plaintiff of the dangerous propensities of the Resisto marking ink product. In such a case, the *739 product-defect causation element of a cause of action requires the plaintiff "to prove that the absence of a warning was a proximate cause of his harm." Coffman v. Keene Corp., 133 N.J. 581, 594, 628 A.2d 710 (1993). In this case, the trial court did not rest its dismissal of plaintiff's complaint on this "product-defect causation" element. Instead, its focus in granting defendants summary judgment was lack of medical proofs establishing a nexus between plaintiff's exposure to the product and her medical condition.
A plaintiff, in products-liability litigation, "must demonstrate that his or her injuries were proximately caused by exposure to defendant's ... product." Ibid.; James v. Bessemer Processing Co., 155 N.J. 279, 297-98, 714 A.2d 898 (1998). In the toxic-tort field, the modern trend has been to relax or broaden the standard of determining medical causation. See James, supra, 155 N.J. at 299-301, 714 A.2d 898; Landrigan v. Celotex Corp., 127 N.J. 404, 413, 605 A.2d 1079 (1992); Rubanick v. Witco Chem. Corp., 125 N.J. 421, 434, 593 A.2d 733 (1991). This is because, in the toxic-tort context, "proof that a defendant's conduct caused decedent's injuries is more subtle and sophisticated than proof in cases concerned with more traditional torts." Landrigan, supra, 127 N.J. at 413, 605 A.2d 1079. A less traditional standard is essential because, unlike the typical personal injury action, the toxic-tort case often involves: (1) exposure of long duration, chronic and repeated; (2) exposure to multiple toxins; and (3) harm normally resulting from biochemical disruption or acute toxic substance as opposed to physical trauma. James v. Chevron U.S.A., Inc., 301 N.J.Super. 512, 531, 694 A.2d 270 (App.Div.1997), aff'd sub nom., James v. Bessemer Processing Co., 155 N.J. 279, 714 A.2d 898 (1998).
In workplace toxic exposure cases, we have adopted the "frequency, regularity and proximity" test first pronounced in Sholtis v. American Cyanamid Co., 238 N.J.Super. 8, 28-29, 568 A.2d 1196 (App. Div.1989), in determining whether plaintiff has made a prima facie case of medical causation. See James, supra, 155 N.J. at 300-03, 714 A.2d 898. At least for summary judgment purposes, where there has been exposure to multiple products over an extended period of time, plaintiff has the burden of proving that her exposure to defendant's product was a "`substantial factor' causing or exacerbating the plaintiff's illness...." Id. at 301, 714 A.2d 898. Plaintiff must "prove `an exposure of sufficient frequency, with a regularity of contact, and with the product in close proximity' to the plaintiff." Ibid. (quoting Sholtis, supra, 238 N.J.Super. at 28, 568 A.2d 1196).
Here, if we credit plaintiff's proofs, we have direct and circumstantial evidence that she was regularly and frequently exposed to Resisto marking ink during her employment with the State during 1990 through 1995. She worked at the Skillman facility from 7:30 a.m. to 3:30 p.m., five days per week, during which she marked clothing labels with the use of a heat seal machine and an ink marking device. The marking device consisted of a wheel, pressed into an ink pad. Plaintiff "re-inked" the pad on a frequent basis. When the ink was applied to the material, a heat sealing machine was applied. Plaintiff spent approximately twenty-five percent of her time marking clothing. Often the air was poorly ventilated. During this time, she experienced dizzy spells, chest pains, and eye irritation. On some occasions, the ink marking machine malfunctioned causing ink to run onto her hands. In our view, plaintiffs make a prima facie *740 showing that plaintiff was frequently and regularly in close proximity to defendant's product.
The critical issue here is whether, indulgently read, the medical reports submitted by plaintiffs were sufficient to overcome defendants' claim that they failed to demonstrate medical causation. On a motion for summary judgment in a toxic-tort case, the narrow issue is whether reasonable jurors could infer, based on the expert testimony, a nexus between plaintiff's exposure to the offending product and her condition. Sholtis, supra, 238 N.J.Super. at 31, 568 A.2d 1196. In that regard, we have noted that summary judgment "is an extraordinary measure to be taken only with extreme caution, especially when a cause of action rests upon expert testimony." Kisselbach v. County of Camden, 271 N.J.Super. 558, 569, 638 A.2d 1383 (App. Div.1994). "[T]he preferred course is to deny summary judgment and permit the matter to proceed, so that the expert's opinion can be fleshed out." Ibid.
Fairly read, we cannot agree with the trial court that the reports failed to establish a prima facie case of causation. The reports at least implicitly advance alternative and not necessarily inconsistent theories: (1) plaintiff developed MCSD due to exposure to pesticides (Dursban) in 1988, causing hypersensitivity to the caustic elements in the Resisto-marked product; and (2) the Resisto product alone was a substantial, contributing factor in causing plaintiff's condition. Drs. Lieberman, Daum, DiGregorio and Boczko, all refer to plaintiff's work history in using Resisto marking ink and concluded that plaintiff's conditions are causally related to chronic chemical exposure to diethylaminoethanol and formaldehyde. The MSDS and fact sheets, referred to by the medical experts, state the Resisto marking ink, containing these toxins, can cause diarrhea, eye irritation, breathing difficulties, headaches and dizziness, all being conditions suffered by plaintiff after exposure to the product.
Moreover, Dr. Lieberman's affidavit and Dr. DiGregorio's report submitted in support of plaintiff's reconsideration motion should have been considered by the trial court. A trial court should hesitate to preclude late filings in a toxic-tort case. Sholtis, supra, 238 N.J.Super. at 17, 568 A.2d 1196. A trial court has discretion to permit supplemental affidavits to be submitted, and this discretion should be exercised to increase, not limit, the likelihood that the information before the court "reflects the facts that could be adduced at trial." Ibid. Dr. Lieberman's October 4, 1999 affidavit is compelling. He found significant that plaintiff had not been exposed to Dursban after 1988, and that her acute symptoms related to her exposure to that pesticide "had essentially resolved." However, it was his medical view that plaintiff had been left "in a more sensitized condition"; that is, plaintiff was hypersensitive to other caustic materials. Focusing on plaintiff's medical and work history records, the doctor again defined the caustic ingredients of Resisto, as evidenced by its MSDS, and concluded that her exposure to the product was "substantially contributed to the development of a severe neurotoxic condition, reactive airways disease, and increased sensitivity." In our view, these reports were sufficient to overcome defendants' summary judgment motion.
The opinions of plaintiffs' experts should, of course, be examined during an N.J.R.E. 104 hearing before being admitted into evidence. Dr. Lieberman, for example, should be permitted to explain the mechanics of diethylaminoethanol and formaldehyde in support of his conclusion that the Resisto product was a substantial factor in causing plaintiff's condition. The focus must be on the data relied on, his methodology, and the reasoning supporting *741 his testimony. Rubanick, supra, 125 N.J. at 449, 593 A.2d 733. The admissibility of his testimony and ultimate conclusions will depend upon his "ability to explain pertinent scientific principles and to apply those principles to the formulation of [his] opinion. Thus, the key to admission of the opinion is the validity of the expert's reasoning and methodology." Landrigan, supra, 127 N.J. at 414, 605 A.2d 1079. This analysis is critical because plaintiffs' experts, at least in part, rely upon the assumption that plaintiff had developed MCSD as a result of her 1988 exposure to Dursban. Defendants argue that MCSD is not a condition generally accepted by the medical community.
The experts must also identify the factual bases for their conclusions and "demonstrate that both the factual bases and the methodology are scientifically reliable." Id. at 417, 605 A.2d 1079. Moreover, if epidemiological or toxicological studies are to provide the basis for the experts' opinion, they must be "`soundly and reliably generated' and be `of a type reasonably relied on by comparable experts in the particular field.'" Id. at 419-20, 605 A.2d 1079 (quoting Rubanick, supra, 125 N.J. at 447, 593 A.2d 733); and see Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 593-94, 113 S.Ct. 2786, 2796-2797, 125 L.Ed.2d 469, 482-83 (1993). After the N.J.R.E. 104 hearing is conducted, the trial court should apply its gate-keeping function to determine whether the experts' opinions are sufficiently reliable to be considered by the jury.
Reversed and remanded for a N.J.R.E. 104 hearing.
NOTES
[1] Philip Vassallo, plaintiff's husband, sues per quod. We will refer to plaintiff Margaret Vassallo simply as plaintiff.