801 A.2d 1186 (2002)
353 N.J. Super. 191
Luisa SUANEZ, Plaintiff-Appellant,
v.
Jennifer EGELAND, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued March 19, 2002.
Decided July 11, 2002.
*1188 Anthony J. Brady, Jr., Voorhees, argued the cause for appellant.
James R. Birchmeier, Tuckahoe, argued the cause for respondent (Powell, Birchmeier & Powell, attorneys; Mr. Birchmeier, of counsel and on the brief).
Bruce H. Stern, Lawrenceville, argued the cause for amicus curiae ATLA-NJ (Stark & Stark, attorneys; Mr. Stern, on the brief).
Before Judges SKILLMAN, WALLACE, JR. and WELLS.
*1187 The opinion of the court was delivered by SKILLMAN, P.J.A.D.
The primary issue presented by this appeal is whether there is a reliable scientific foundation for purported expert opinion testimony by a bio-mechanical engineer that a low-impact automobile accident cannot cause a herniated disc.
Plaintiff was injured on March 31, 1994, when a car being driven by her husband on Route 130 in Pennsauken was hit in the rear by a car driven by defendant. Defendant admitted liability, and the case was tried on damages only.
A jury returned a verdict in defendant's favor, finding that plaintiff had not overcome the verbal threshold for the award of damages in an automobile negligence personal injury case. See N.J.S.A. 39:6A-8a. On appeal, we concluded that the trial court had committed reversible error by admitting into evidence a videotape depicting a car-crash dummy in a car that was struck at five miles per hour. Suanez v. Egeland, 330 N.J.Super. 190, 749 A.2d 372 (App.Div.2000). Accordingly, we remanded the case for a new trial.
At the second damages trial, defendant heavily relied upon the opinion of Lawrence Thibault, an expert in "bio-mechanics" and "bio-mechanical engineering," that the "delta-V" (change in velocity) as a result of the collision between defendant's car and the car in which plaintiff was riding "was approximately five miles per hour or less," and that plaintiff's herniated lumbar disc could not have been caused by such a low-impact accident. Before trial, plaintiff asked the court to exclude Thibault's proposed expert opinion on the ground that it has no scientific basis. The trial court denied the request. At the beginning of defendant's case, plaintiff asked the court to conduct an evidentiary hearing regarding the scientific basis of Thibault's proposed expert opinion testimony, but the court concluded, based primarily on dictum in an unreported opinion of this court, that Thibault's proposed opinion testimony was admissible. Thibault then proceeded to testify before the jury that the collision between defendant's car and the car in which plaintiff was riding did not involve sufficient force to have caused plaintiff's herniated disc. The jury subsequently returned a verdict in defendant's favor, finding that plaintiff had not overcome the verbal threshold.
On appeal, plaintiff's primary argument is that defendant failed to establish the *1189 requisite scientific basis for Thibault's purported expert opinion that the subject automobile accident could not possibly have caused her herniated disc.
Preliminarily, we note that the trial court should have conducted a preliminary hearing under Rule 104 concerning the admissibility of Thibault's proposed bio-mechanical expert opinion testimony.[1] See State v. Harvey, 151 N.J. 117, 167, 699 A.2d 596 (1997), cert. denied, 528 U.S. 1085, 120 S.Ct. 811, 145 L. Ed.2d 683 (2000); Vassallo v. American Coding & Marking Ink Co., 345 N.J.Super. 207, 217-18, 784 A.2d 734 (App.Div.2001). Such a hearing would have afforded the parties and the court an opportunity to explore fully the purported scientific bases of Thibault's opinions outside the presence of the jury. However, we are satisfied that the parties had an adequate opportunity to present evidence relevant to this issue at trial and that a remand for a Rule 104 hearing would not produce any significant additional evidence regarding the scientific basis of Thibault's expert testimony.
In New Jersey, scientific evidence is admissible in a civil case if "it derives from a reliable methodology supported by some expert consensus." Harvey, supra, 151 N.J. at 168, 699 A.2d 596 (citing Landrigan v. Celotex Corp., 127 N.J. 404, 417, 605 A.2d 1079 (1992); Rubanick v. Witco Chem. Corp., 125 N.J. 421, 449, 593 A.2d 733 (1991)). There are three ways a party offering the results of scientific evidence can demonstrate its reliability: "(1) the testimony of knowledgeable experts; (2) authoritative scientific literature; and (3) persuasive judicial decisions." Windmere, Inc. v. International Ins. Co., 105 N.J. 373, 379, 522 A.2d 405 (1987); see also Rubanick, supra, 125 N.J. at 432, 593 A.2d 733. A party offering novel scientific evidence bears the burden of demonstrating its reliability. Harvey, supra, 151 N.J. at 167, 699 A.2d 596.
Defendant failed to establish the required foundation of reliability for Thibault's opinion in any of these ways. Thibault is not a physician or medical researcher. His education and training are in the fields of physics and mechanical engineering, with only basic training in anatomy, physiology and pathology. Moreover, Thibault has not himself conducted or observed tests of low-impact collisions on humans. His knowledge of this subject is derived solely from literature in the field. Consequently, the reliability of Thibault's opinion turns on whether that literature provides a reliable scientific foundation for the conclusion that a low-impact automobile accident cannot cause a herniated disc.
Defendant did not introduce into evidence any of the scientific literature upon which Thibault relied. Consequently, the only information in the trial record concerning the content of that literature is Thibault's testimony.
Thibault described that literature only in very broad and general terms:
Q. [I]f you could just give us an example or run through the studies that you may have relied upon in formulating that chart?
A. Well, I guess the earliest work was done by Brinkman (phonetic) in *1190 1961. Isolated spinal segments were taken from fresh cadavers, put in a compression machine where you can actually measure the forces to compress until the forces got to a high enough level where they actually start to cause failure of the tissue. That was done over a broad range of age groups in terms of fresh cadaveric material. And those numbers were added to over the next 30 or 40 years by a lot of other investigators.
....
Crash tests have been performed where we can't put instruments inside humans, human volunteers and let us measure those forces so we use dummies. And there's been about 40 years of development of high tech dummies which contain all the instrumentation we need.
....
And then, I guess the last is the human volunteer exposure studies that have been done, where mainly scientists like myself, although I wasn't involved in this study, have volunteered. A lot of M.D.'s and Ph.D.'s and graduate students that were asked to volunteer. In all, there were 646 human volunteers in a car subjected to rear end impacts where the Delta V's went to as high as 11 miles per hour....
These were published in journals throughout the world. The studies were done in 15 different institutions in seven different countries. And that's kind of, you know, the ultimate human volunteer validation, if you will, or verification that, coupling the cadaver work, where you measure the material properties, to the dummy tests where you can put instrumentations inside at the right anatomic locations, to the ultimate simulation, which is to have the human volunteer.
No injuries, other than complaints of stiff necks at the high end, typically developing the date after, and treating basically with ibuprofen, spontaneously resolve over 72 hours.... There's never been reported a disk injury of any kind in 646 studies.
On cross-examination, plaintiff's counsel attempted to get Thibault to identify specific scientific literature that supports his conclusion that the subject accident could not possibly have caused a herniated lumbar disc, but the only specific tests to which Thibault referred involved either cadavers or military personnel under controlled testing conditions:
Q. Where were these studies reported? Lumbar studies?
....
A. I didn't bring that voluminous body of literature with me. There are probably 100 articles.
Q. Okay. Name one.
A. "Spine," Brinkman.
Q. What date?
A.1961, I stated already.
Q. That's the one with the
A. There's
Q. dead people that you mentioned.
A. Dead. Dead, yes. Cadavers.
....
Q. Okay. So that's one study. Name another study.
A. Brinkman, `64.
Q. Okay. What was the subject?
A. Weiss, `64. Again, taking motion segments, looking at the material properties of the vertebral bodies, the disks, the elastic lamina, the nucleus pulposus, the posterior and anterior ligaments.
Q. Okay. On dead people, am I correct?
*1191 A. Obviously. We don't do that on living human beings.
....
Q. Tell me any journals besides that one; you just named that one. Name other ones.
A. Well, there's an entire book that was published by the Navy where they used Navy volunteers riding on sleds.
....
The data were compared to pilots who ejected and
....
[U]p to Mach two, where they got compressive loading conditions pulling 25 Gs when they fire the rocket motor after they've blown the canopy, and they've gotten fractured vertebral bodies. That data was correlated with the sled testing that was done in Mishue (phonetic). That's been published in Air Guard, Aircoby (phonetic), SAE (phonetic). A whole text was compiled.
Q. Okay. Let'swe'll go on that there one. That was the United States Navy.
A. Yes.
Q. I assume that was sailors?
....
A. I don't know; I assume they were sailors.
....
Q. Would it be true that people who are in the military have to have certain physical capacity to be in the military?
A. Yes.
....
Q. Are most sailors younger than the average population of the United States? That be fair to say?
A. I would assume that admirals probably retire before 65, and the
....
A. and the young kids are 18.
Q. Okay, but the average. There's not that many admirals in the United States Navy, am I correct?
A. I don't know.
Q. You don't know?
A. I'm not an authority on the hierarchy of the U.S. Navy.
Q. You think there's maybe a little more petty officers in the United States Navy than admirals?
A. Probably.
Q. Okay. Now, how many admirals were engaged in the tests?
A. I have no idea.
Q. Okay. So will you agree with me that perhaps that test was not equivalent to Mrs. Suanez because of age, health?
A. Right. I would say that they would probably be skewed....
....
Q. Now that was a sled test?
A. Those were sled tests. What they do is they put the individual lying rearward. If you could imagine rotating the seat this way and then pushing as if it's a push test.
Q. Now, do those subjects in the Navy test, did they know they were being tested or was that a trick by the Navy?
A. No, they knew they were being tested.
Q. So would it be fair to say if you know you were going to get an impact, you might brace for it?
A. Yes, that's the worst thing you could do.
Q. Is it?
A. Yeah, the relaxed condition, not knowing it's coming, doesn't allow you to contract your muscles and already pre-tense them up so that you can't take a *1192 lot more tolerance beyond a certain point.
Q. So a football player that gets in his position shouldn't brace himself when he gets hit from the other, from the defender in a football game?
A. I don't know what that has to do with anything.
Q. Okay. So it's not good to actually brace yourself if you're going to get in an accident?
A. No, I'm saying that it'syou, your whole body stiffens when you brace yourself. So you're in a more vulnerable position than if you're completely relaxed.
....
Q. [T]he studies. You mentioned the United States Navy. You mentioned the ones in the early `60s. What other ones specifically for lumbar?
A. Well, the Air Force did an equivalent set. The Navy also, in Pennsylvania at Warminster, built an ejection tower where they had human volunteers sit in an ejection seat. But rather than just blowing them up and letter their parachute open since they were at ground level, they blew them up a very long rail where they were stopped eventually at the top of the rail. The Air Force at Wright Patterson in Columbus, Ohio has done a lot of vertical ejection. I've done work with the Army at Fort Rucker in Alabama, where we're trying to protect helicopter crews from flat belly emergency crash landings. And so the idea was to develop crushable seats so that they would minimize any potential for pelvic or low back trauma. That literature again's available at Air Guard, Aircoby, SAE, Triple AM (phonetic).
When plaintiff's counsel pressed Thibault concerning the existence of any scientific literature that would support his opinion concerning the effect of a rear-end automobile collision upon middle-aged women with pre-existing degenerative conditions, Thibault responded with only general and vague references to various articles published in journals in "seven different countries":
Q. But those Air Force and Army tests weren't done with middle aged women, am I correct?
A. No. The only studies that were done in that regard I've already cited. And they varied in age from 19 to 61, both men and women. And these are worldwide.
Q. Okay. You just got to the point. That's the only study that you're aware of?
A. Yeah, for living human volunteers. Right.
Q. Okay. And
A. Of that age group.
Q. Okay. And where is that report published?
A. Well, I have the references here. They're in Canadian Medical Journal, SAE, Accident Reconstruction Journal of Medicine, Aircoby, SAE Toptech (phonetic), Journal of Forensic Science, Journal of Oral Medicine.... Accident Analysis and Prevention. That's the Triple AM Journal, more Aircoby and SAE papers, another set in Southwestern Association in Falkland, the New Zealand Journal, University of Texas Engineering Journal. There's 15 different institutions with a lot of different journals in seven different countries.
....
Q. And how many were middle aged women in the tests?
A. I don't know.
....
Q. Okay. Is there any indication in your studies that you're relying upon *1193 whether these people had pre-existing degenerative changes in their lumbar spine?
A. I would have to read every journal article. No. I mean, I'm sure they examined them all.
These lengthy excerpts from Thibault's testimony show that he did not identify any scholarly literature which shows the reliability of his purported expert opinion that the subject automobile accident could not possibly have caused plaintiff to suffer a herniated lumbar disc. The only specific scientific tests to which Thibault referred were performed either upon cadavers or upon military personnel under controlled conditions quite dissimilar from an automobile accident. Moreover, there is no indication that the persons who performed the tests or others in the scientific community have concluded that they provide a reliable foundation for drawing any conclusions concerning the physiological effects of a low-impact automobile accident upon a middle-aged woman. Thibault's further reliance upon unidentified articles by unidentified authors in various international journals did not provide any discernable foundation in scholarly literature for his opinion.[2] See Suanez, supra, 330 N.J.Super. at 194, 749 A.2d 372. A court should not admit a purported scientific opinion "that is connected to existing data only by the ipse dixit of the expert." General Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 519, 139 L. Ed.2d 508, 519 (1997).
Defendant also failed to show the reliability of the kind of purported expert opinions expressed by Thibault by the third recognized method,"persuasive judicial decisions." Windmere, supra, 105 N.J. at 379, 522 A.2d 405. To the contrary, the decisions brought to our attention have concluded that there is no reliable scientific foundation in bio-mechanical studies for an expert opinion that a low-impact automobile accident cannot cause a herniated lumbar disc or other serious injury. See, e.g., Smelser v. Norfolk Southern Ry. Co., 105 F.3d 299, 305 (6th Cir.), cert. denied, 522 U.S. 817, 118 S.Ct. 67, 139 L.Ed.2d 29 (1997); Salerno v. Tudor, 2002 WL 120608 (Cal.Ct.App.2002); Schultz v. Wells, 13 P.3d 846, 851-52 (Colo.Ct.App. 2000); Cromer v. Mulkey Enter., Inc., 254 Ga.App. 388, 562 S.E.2d 783, 785-88 (2002); Whiting v. Coultrip, 324 Ill.App.3d 161, 258 Ill.Dec. 111, 755 N.E.2d 494, 499-500 (2001); Brock v. Artis, No. 45C01-9602-CT-0034 *1194 (Lake Cty. Cir. Ct., Ind. July 16, 1998); Clemente v. Blumenberg, 183 Misc.2d 923, 705 N.Y.S.2d 792 (N.Y.Sup.Ct.1999); Yaremchak v. Cornman, No. 97-SU-00701-01 (York Cty. Ct. Com. Pl., Pa. August 8, 2000); Tittsworth v. Robinson, 252 Va. 151, 475 S.E.2d 261 (1996); Mayse v. Kidd, No. 98-C-129 (Lincoln Cty. Cir. Ct., W. Va. June 8, 2000).[3]
The only decision cited by defendant that seemingly approved the form of expert opinion testimony presented by Thibault is this court's unreported decision in Barbour v. Laurel Coffee Co., A-1882-96T1 (Jan. 22, 1998). However, we held in Barbour that Thibault "was not competent to testify regarding wear and tear of discs," and that "[h]is testimony at times exceeded the scope of his expertise and experience and impermissibly ventured into the world of medicine." (slip op. at 7). The observation upon which defendant reliesthat "Dr. Thibault was surely qualified to testify as an expert regarding whether a low-impact collision, such as the one in this case, could cause a severe neck injury, such as the herniated disc that plaintiff suffered" (slip op. at 6)was not essential to our decision and therefore was dictum. Most importantly, the plaintiff in Barbour did not object at trial to Thibault's testimony and thus our comments were not grounded on an evidentiary record concerning the scientific foundation of his opinions. Consequently, Barbour does not qualify as a "persuasive judicial decision" which supports the conclusion that the expert opinion Thibault expressed in this case was based on scientific knowledge that is considered to be reliable.
In sum, defendant failed to establish a reliable scientific foundation for Thibault's purported expert opinion on the basis of Thibault's own research work, authoritative scientific literature or persuasive judicial decisions. Moreover, Thibault's testimony played such a critical role in the defense of this action that its erroneous admission cannot be found to have been harmless.
Accordingly, the judgment in defendant's favor is reversed and the case is remanded for a new trial on damages.
NOTES
[1] Although defendant presented similar expert opinion testimony in the first damages trial, plaintiff did not contest its admissibility and the trial court did not make any ruling on the issue. Thus, the mere fact that such testimony was presented without objection at the first trial has no binding effect under the law of the case doctrine or principles of collateral estoppel. See Slowinski v. Valley Nat'l Bank, 264 N.J.Super. 172, 181-83, 624 A.2d 85 (App. Div.1993).
[2] To assure ourselves that we had a complete record of any available scientific materials that might support the expert opinion testimony Thibault gave at trial, we inquired at oral argument whether defendant could identify any specific scholarly literature supporting that opinion which Thibault had failed to mention at trial. In response, defendant submitted a letter from Thibault, dated March 25, 2002, which states in pertinent part:

[I]t is necessary to inform you that such a task is rather extensive, and is beyond the scope of the services provided by Biomechanics, Inc.
Attached please find the following bibliography that serves as a list of selected literature that has been relied upon in reaching my opinions in this matter. All of this literature is publicly available, and can be retrieved from any of a number of sources specializing in technical literature retrieval and/or archiving.
In order to furnish hard copies of each and every article listed, some time and expenses must be incurred before they can be produced. To this end, I have also attached a budget representing a minimum and an estimated maximum to perform such services, provided by a research organization that relies on an extensive in house collection of literature, as well as the resources available at Stanford University and the University of California at Berkeley.
Based on this response, it is clear that defendant is not in a position to submit any additional materials that could demonstrate a scientific foundation for Thibault's purported expert opinion.
[3] The unreported opinions in Salerno, Brock, Yaremchak and Mayse are not cited as legal precedent but rather as additional evidence of defendant's failure to demonstrate the reliability of the purported expert opinion expressed by Thibault by means of persuasive judicial decisions. See R. 1:36-3.