903 A.2d 1068 (2006)
387 N.J. Super. 262
Hajrie HISENAJ, Plaintiff-Appellant, and
Binak Hisenaj, her husband, Plaintiff,
v.
Amanda L. KUEHNER, Defendant-Respondent, and
GMAC, Defendant.
Superior Court of New Jersey, Appellate Division.
Argued October 18, 2005.
Decided August 3, 2006.
*1069 Michelle Joy Munsat argued the cause for appellant.
Michael B. Devins, Morristown, argued the cause for respondent (McElroy, Deutsch, Mulvaney & Carpenter, attorneys; Mr. Devins, of counsel and on the brief; Lisa Lomelo, on the brief).
Before Judges COBURN, COLLESTER and LISA.
The opinion of the court was delivered by
*1070 LISA, J.A.D.
We consider in this appeal, as we did in Suanez v. Egeland, 353 N.J.Super. 191, 801 A.2d 1186 (App.Div.2002), the propriety of allowing biomechanical engineering testimony that a low-impact rear-end collision cannot cause a herniated disc. In Suanez, we found such testimony scientifically unreliable because the expert relied exclusively on scientific literature, and he could identify no specific literature except with respect to tests performed on cadavers or military personnel under controlled conditions quite dissimilar from an automobile accident. Id. at 200, 801 A.2d 1186. We further found a lack of scientific reliability because there was no evidence that those who performed the tests upon which the expert relied, or others in the scientific community, concluded that the tests provided a reliable foundation for drawing any conclusions regarding the physiological effects of a low-impact collision on a middle-aged woman, such as the plaintiff in that case. Id. at 200-01, 801 A.2d 1186. We therefore held that admission of the expert testimony was reversible error. Id. at 203, 801 A.2d 1186.
In this case, plaintiff was also a middle-aged woman, forty years old at the time of the accident, and she suffered from asymptomatic degenerative disc disease. She claimed that as a result of the accident she suffered three herniated cervical discs and one herniated lumbar disc,[1] for which she underwent two extensive surgical procedures, four to five years after the accident. Plaintiff presented four medical experts who testified that she suffered herniated discs caused by the accident. She claimed she suffered "permanent consequential limitation of use of a body organ or member" as well as "significant limitation of use of a body function or system," under the provisions of the verbal threshold in effect at the time of the accident on March 2, 1998. See N.J.S.A. 39:6A-8(a); Oswin v. Shaw, 129 N.J. 290, 315, 609 A.2d 415 (1992).
The defense proffered the testimony of a biomechanical expert, Harold Alexander, who would testify that the low-impact collision could not have caused plaintiff's herniated discs, or any serious injury. The defense theory was that some of the herniations identified by plaintiff's medical experts did not exist, that her surgeries were unwarranted, and that, to the extent she had any herniations or suffered from any significant disc pathology after the accident, it was a result of her continuing disc degeneration, and not caused by the accident.
After conducting a hearing pursuant to N.J.R.E. 104, the trial judge distinguished the situation from Suanez and allowed Alexander to testify before the jury. The judge was satisfied that Alexander based his opinion on seventeen identified scientific studies, conducted over a thirty-four-year period, using live volunteers consisting of 151 men and 52 women of varying ages, none of whom suffered chronic injuries after being subjected to rear-end impacts similar in magnitude to that involved in this accident. The judge was further persuaded because, unlike the expert in Suanez, Alexander also relied on his own medical research in addition to the scientific literature. The jury rejected plaintiff's claim of permanent injury caused by the accident.
We hold that Alexander did not provide a reliable scientific basis to support his opinion. Alexander's trial testimony had the clear capacity to influence the verdict. *1071 Accordingly, we reverse and remand for a new trial.
The trial was as to damages only.[2] Although the jury found that plaintiff did not suffer permanent consequential limitation of use of a body organ or member caused by the accident, it found that she suffered significant limitation of use of a body function or system caused by the accident, for which it awarded her $50,000. The jury essentially determined that plaintiff failed to prove that the accident caused her to suffer herniated discs and necessitated her surgeries. The jury apparently found that the accident caused plaintiff's pre-existing disc disease to become symptomatic and painful for a time, but it did not cause any herniations or other permanent injuries.
When the accident happened, plaintiff was alone in her car, stopped at a stop sign, waiting to make a left turn. Her car was slightly angled to the left and her head was turned about forty-five degrees to the left.[3] Defendant was traveling in the same direction as plaintiff. When defendant saw plaintiff's stopped car, she was unable to stop her car in time to avoid a collision. She struck plaintiff's car in the rear. According to defendant's accident reconstruction expert, defendant's vehicle was traveling less than eight miles per hour at impact, and the change in velocity (Delta V) to plaintiff's vehicle was less than five miles per hour. The reconstructionist compared the severity of such an impact to that experienced in a bumper car amusement ride.
Plaintiff did not obtain medical treatment immediately after the accident. She drove herself home from the accident scene. She began a course of chiropractic treatment two days later. For approximately thirteen months she underwent conservative treatment by several physicians, including an orthopedist and neurologist. Her treatment included physical therapy, use of a TENS unit, acupuncture, and medications. Cervical and lumbar MRIs were performed on March 10, 1998. The radiologist who performed the MRIs reported that plaintiff's neck showed mild degenerative disc disease at C3-4 through C5-6, along with a "mild posterior protrusion of disc material centrally located mildly impressing on the thecal sac consistent with either a herniation or a bulge." The radiologist found that "at L4-5, there is degenerative disc disease with spondylitic ridging and a posterior disc bulge." Further MRIs were performed on September 23, 1998, and the radiologist reported similar findings.
On October 12, 1998, plaintiff underwent a medical exam by an orthopedic surgeon described by the parties as an independent examiner. Based upon his examination and his review of the MRI performed on March 10, 1998, he concluded that plaintiff's L4-5 disc was herniated and three levels of discs in her cervical spine were "out of place." After examining plaintiff again on February 8, 1999, the examiner reported identical findings. He recommended surgical removal and replacement of the L4-5 disc. He found that plaintiff's injuries were caused by the accident and were permanent. He noted that plaintiff's pre-existing degenerative disc disease was age-appropriate and asymptomatic before the accident.
*1072 The neurologist and orthopedist who treated plaintiff during this period, as well as the independent medical examiner, testified at trial. Based upon plaintiff's history, their clinical findings, and the MRIs and other diagnostic test results, they opined that plaintiff suffered disc herniations caused by the accident.
In 1999, plaintiff was "just sick of going to doctors" and was "frightened" by the prospect of undergoing recommended epidural injections or surgery. She discontinued active treatment. She self-treated through exercise, hot baths, heating pads, and taking Tylenol and previously-prescribed medications. She claimed she was never pain-free. By late 2001, plaintiff's pain intensified and, after about a two-year hiatus, she resumed active treatment. Further diagnostic tests were performed in early 2002. Plaintiff came under the care of Dr. Charles Kalko, a neurosurgeon. Based upon his review of the MRI films from 1998 and the more recent 2002 studies, combined with history and clinical findings, Kalko diagnosed herniated discs caused by the accident at L4-5 and C3-4, C4-5, and C5-6. On May 14, 2002, he performed an L4-5 bilateral laminotomy, decompression, full diskectomy, and arthrodesis with fusion cage and instrumentation. On February 4, 2003, he performed an anterior cervical microdiscectomy, arthrodesis and internal fixation under microsurgical instrumentation at C3-4, C4-5, and C5-6. Kalko testified at trial that the surgeries were necessitated by injuries plaintiff suffered in the March 2, 1998 accident, and that plaintiff was left with permanent disability.
Defendant presented at trial the testimony of an orthopedic surgeon, who examined plaintiff on three occasions and reviewed the 1998 and 2002 MRIs. He opined there were no cervical disc herniations, but only mild degenerative changes reflected on the 1998 studies. In his opinion the 2002 cervical study showed "no definite herniations" or "significant neural impingement." He concluded that plaintiff's neck problems were the result of degenerative disc disease. This examiner opined that the 1998 lumbar studies revealed only disc degeneration at the L4-5 level associated with the aging process, but the 2002 lumbar study revealed a bulge and possible herniation at L4-5 that did not appear on the earlier studies. Again, the examiner concluded that any problem in plaintiff's lower back was the result of degeneration, not trauma. He "did not feel there was any objective finding of any organic lesion in the neck or in the low back produced by this accident that should have been treated by surgery."
Defendant also presented a neuroradiologist, who, based on his review of plaintiff's 1998 and 2002 MRIs and other diagnostic tests, found no traumatic injury to plaintiff's cervical or lumbar spine from the March 2, 1998 accident. He found a mild bulge at L4-5 in the 1998 and 2002 studies, which he deemed a result of plaintiff's degenerative changes. He found only degenerative changes on the 1998 cervical studies, but noted new findings on the 2002 cervical studies, namely a bulge at C4-5 and a small herniation at C5-6. In his opinion these new findings "had to be due to causes between the . . . MRI of 9/23/98 and the MRI of 1/25/02." He concluded that all positive findings were "most compatible with a degenerative process" and were not caused by the accident of March 2, 1998.
The opinions of the experts were plainly at odds as to whether the accident caused any serious cervical or lumbar injuries to plaintiff, necessitating surgery and resulting in permanency. Within this framework, Alexander provided the jury with his expert opinion that "I don't believe there's *1073 a biomechanical mechanism for a chronic injury in this collision, nor do I believe that she has sustained a chronic injury." He saw "no mechanism for chronic injury," and based upon his review of the medical records opined "there is no chronic traumatic injury to the [plaintiff's] spine."
In summation, defense counsel emphasized the preeminence of Alexander's opinion in the causation analysis:
Did Miss Hisenaj sustain a permanent or significant injury, that can be causally related to the March 2nd, 1998 accident? And I believe that we have proved to you that she did not. And we have proved to you through scientific evidence, and we have proved to you through the objective evidence.
Let's start with the scientific evidence. What do we have in this case to prove that she was not injured in this accident?. . . You have heard expert testimony in this case, it is scientifically impossible to herniate three disks in your neck, and one disk in your back, as a result of a minor, low impact collision.

. . . .
[Alexander] testified here yesterday. All right. He's a Ph.D. He's a biomechanical engineer. And you'll recall several times throughout this case you heard testimony from doctors, plaintiff's experts, questions were asked of them, well, you don't know what the speed of the vehicle was, you don't know what forces were present in the car, you don't know if there was an injury causing mechanisms. You know what they all said, that's not what I do, that's not what a medical doctor does, that's what a biomechanical engineer does. You heard from a biomechanical engineer in this case, and he told you that it was just scientifically impossible to have sustained the injuries that plaintiff is claiming to her neck, and her back, which would have required surgery. He also told you that he, as a biomechanical engineer, teaches medical doctors about the cause of an injury, how do you identify the cause of an injury. He told you, medical doctors, they identify a diagnosis to an injury. Most medical doctors don't have that type of training, but he does provide it, and he's provided it for over 19 years.
The plaintiff's experts, medical experts in this case have testified, yeah, there was a car accident, and there were complaints of pain after the car accident; therefore, it's causally related. That's not the way that, it's just irresponsible to say that. To determine a causal relation to an accident, based upon nothing more than, I didn't have pain before, I've got pain now, and there was in a car accident. They don't take into account anything, as far as the speed of the vehicle, the damage to the vehicle, what the type of impact was. With that limited information, ladies and gentlemen, I submit that you cannot determine whether it's causally related.
[Emphasis added.]
In Suanez, we set out the test for admissibility of scientific evidence:
In New Jersey, scientific evidence is admissible in a civil case if "it derives from a reliable methodology supported by some expert consensus." [State v. Harvey, 151 N.J. 117, 168, 699 A.2d 596 (1997)] (citing Landrigan v. Celotex Corp., 127 N.J. 404, 417, 605 A.2d 1079 (1992); Rubanick v. Witco Chem. Corp., 125 N.J. 421, 449, 593 A.2d 733 (1991)). There are three ways a party offering the results of scientific evidence can demonstrate its reliability: "(1) the testimony of knowledgeable experts; (2) authoritative scientific literature; and (3) persuasive judicial decisions." Windmere, Inc. v. International Ins. *1074 Co., 105 N.J. 373, 379, 522 A.2d 405 (1987); see also Rubanick, supra, 125 N.J. at 432, 593 A.2d 733. A party offering novel scientific evidence bears the burden of demonstrating its reliability. Harvey, supra, 151 N.J. at 167, 699 A.2d 596.
[Suanez, supra, 353 N.J.Super. at 195-96, 801 A.2d 1186.]
Prior to trial, plaintiff moved in limine to exclude Alexander's proposed testimony. In his report, Alexander relied on seventeen studies carried out over thirty-four years, involving 203 men and women, with Delta Vs from 2.5 to 8 miles per hour. The subjects experienced some acute injuries (e.g. strains or sprains that cause neck stiffness and headaches that dissipated, within hours, days or weeks), but no chronic injuries (those lasting more than one or two months and requiring some significant intervention for treatment and surgical intervention). According to Alexander, there is no biomechanical basis for chronic injury in a less than five mile per hour Delta V collision. He opined that plaintiff "did not sustain any significant injuries as a result of the impact in the March 2, 1998 collision," that her "alleged chronic complaints are not consistent with the low force environment that she was exposed to in the subject accident," and that "[a]ny objective findings . . . are a result of ongoing degenerative conditions and/or previous or subsequent trauma [and] are unrelated to the accident of March 2, 1998."
At the Rule 104 hearing, Alexander described his educational background, which was in mechanical engineering. He held a Ph.D. in that field. He had only basic training in anatomy and physiology. He never conducted or observed any low-impact collision tests. For nineteen years, he was affiliated, in succession, with two medical schools, where he taught orthopedic residents programs in the mechanics of injury and participated in rounds with medical doctors in the evaluation of patients, including trauma patients with orthopedic issues. He was director of orthopedic research at both medical schools, and he conducted experiments with cadaver parts, determining the strength of various materials making up the musculoskeletal system. Thus, unlike the expert in Suanez, Alexander considered himself a medical researcher. See Suanez, supra, 353 N.J.Super. at 196, 801 A.2d 1186.
Alexander contended that in formulating his opinion he relied in part on his own knowledge, based on his medical research and experience. However, he did not elaborate on any specific testing he had done on components of the spine, including the methodology and results, that would provide a basis for his opinion that five mile per hour or less Delta V rear impact cannot cause a chronic spinal injury.
Alexander also relied in part on the seventeen studies. He listed them in an attachment to his report and he produced them at the Rule 104 hearing. They were marked for identification as a group exhibit. Alexander did not describe any of the studies with particularity, but he emphasized that they involved 203 men and women of varying ages. Thus, the defense argued, the shortcoming in Suanezthat the studies relied on by the expert there were limited to cadavers and military personnel and no specific studies were identifiedwas overcome here.
The Rule 104 record contains no evidence that the seventeen studies are generally recognized and relied upon in the scientific community as authoritative. There is no evidence that they were peer reviewed. Alexander testified that "many of [the authors] are well published in the field," and, when asked whether he recognized them as authorities in their respective fields, he responded, "I would say *1075 so, yes." The record is barren of any evidence that the seventeen studies are fairly representative of the prevailing results for these kinds of tests. The record contains no evidence that the size of the data base, 203 subjects over a thirty-four year period, is sufficient to be scientifically and statistically significant. The potential effect of this circumstance may be greatly magnified when considering the paucity of subjects with relevant characteristics similar to plaintiff.
The parties did not include the studies as part of the record on appeal. See R. 2:5-4(a). After oral argument, we directed the parties to file them with us. See Harvey, supra, 151 N.J. at 167, 699 A.2d 596 ("When reviewing a decision on the admission of scientific evidence, an appellate court should scrutinize the record and independently review the relevant authorities, including judicial opinions and scientific literature."); see also Suanez, supra, 353 N.J.Super. at 201 n. 2, 801 A.2d 1186 (To assure itself it had "a complete record of any available scientific materials that might support the expert opinion testimony" at trial, the appellate court "inquired at oral argument whether defendant could identify any specific scholarly literature supporting that opinion which [the biomechanical engineer] had failed to mention at trial."). We order that the record on appeal be supplemented to include the seventeen studies relied upon by Alexander.
After receipt of the studies, we directed the parties to file supplemental briefs addressing them. We have reviewed the studies. In our view, several aspects of the studies undermine their reliability as a basis for Alexander's opinion in this case.
According to Alexander, fifty-two women were included in the studies. We could not identify that precise number in our tabulations. For purposes of our analysis, we accept Alexander's number. Plaintiff was forty years old with pre-existing degenerative disc disease. It is clear from the studies that women are at greater risk than men to suffer cervical flexion-extension injuries. This may be a result of anatomical and physiological differences, such as greater head mass relative to the circumference, length and strength of the neck, resulting in increased head acceleration. It may also be a result of other factors. In some studies, in recognition of the greater susceptibility to injury, female participants were subjected to fewer impacts than men. In some cases, women dropped out before completion of the test program due to higher discomfort levels.
It is also beyond dispute that an individual with degenerative disc disease has increased susceptibility to spinal injury. A flaw in the studies relied upon in Suanez was that the living volunteers were military personnel, deemed to be younger and healthier than a representative sample of the driving public and of the plaintiff in that case. From our review of the studies in this case, it appears that a majority of the volunteers were younger and healthier than plaintiff and the public-at-large. Although the ages of test subjects are not completely clear in all of the studies (e.g., some specify only a range), and although some were plaintiff's age or older, our assessment is that a disproportionately large percentage of those involved were considerably younger than plaintiff. They would be likely to have degenerative changes less significant than plaintiff or none at all. And, in some studies, individuals with any spinal pathologies, including degenerative changes, were screened out and not allowed to participate.
The general format of these studies involved collisions in which the test subject was seated straight up and facing forward, and subjected to a "square" impact. In at least two studies, it was noted that if the *1076 head is turned at impact the potential for injury increases. Very little testing was done in this regard for obvious reasons. As we have stated, plaintiff testified that her head was turned forty-five degrees to the left at the time of impact.
It is thus evident that these studies reflect much less testing on women than men. Yet it is women who are at higher risk of cervical injuries. The test data upon which Alexander relied contains relatively few middle-aged women with degenerative disc disease, and probably none subjected to an impact while their head was turned. Yet, in reliance on that test data, Alexander was permitted to tell the jury that it is scientifically impossible for plaintiff to have suffered a chronic spinal injury as a result of this accident.
Biomechanical engineering testimony may well be relevant and helpful to jurors in assessing issues in some cases. See N.J.R.E. 702. But when general principles, with some superficial applicability, are applied to a specific situation that differs significantly from the underlying basis supporting the general principles, the application is either irrelevant, see N.J.R.E. 401, or its minimal relevance is likely to be substantially outweighed by the risk of undue prejudice, confusion of issues, or misleading the jury, see N.J.R.E. 403. In a case similar to the one before us, dealing with the admissibility of biomechanical engineering testimony, the Delaware Supreme Court recently explained it this way:
Biomechanics is defined as "the mechanical bases of biological, especially muscular, activity; also: the study of the principles and relations involved." For purposes of simplicity, we define biomechanics as the study of the effects of forces and motion on the human body. Accordingly, we recognize that an individual demonstrating knowledge, skill, experience, training or education in the field of biomechanics may be qualified to testify generally about how the human body will react to the impact of forces exerted upon it during an automobile accident. The use of applied physics by trained engineers aided by computer simulations, control groups and crash test dummies, does create indicia of reliability and may be relevant and ultimately trustworthy in the circumstances of a given case. We must, however, caution that it is the very predictability and consistency of applied physics that makes biomechanical evidence reliable in some circumstances but not necessarily in others. For example, if the crash test dummy or a member of the control group is replaced with an uniquely susceptible driver, those indicia of reliability become a facade. In different circumstances, this Court has held that unless a "special nexus" i.e., a logical connection, is shown between the evidence of common behavior and the facts of the case, the use of such common behavior evidence can be highly prejudicial. Here, the engineering constants that anchor biomechanical principles are analogous to the "common behavior" that requires a special nexus to the facts. Extrapolating from general biomechanical principles to demonstrative evidence that supports or disproves injury to an individual may not be reliable in every case. We, therefore, hold that a trial judge may admit biomechanical expert opinion that a particular injury did (or did not) result from the forces of an accident only where the trial judge determines that the testimony reliably creates a connection between the reaction of the human body generally to the forces generated by the accident and the specific individual allegedly injured or another determinative fact in issue.
[Eskin v. Carden, 842 A.2d 1222, 1228-30 (Del.2004) (footnotes omitted).]
*1077 Applying those principles, the court affirmed the trial court's disallowance of the proffered expert testimony that the physical forces in the low-impact collision could not have caused the plaintiff's herniated disc, noting that the plaintiff had a pre-existing back injury, unaccounted for in the studies in the "field" of biomechanics upon which the expert relied. Id. at 1231-32. Thus "there was a danger that the jury would be confused or misled into believing that [the plaintiff] fell within the `field's' `one-size-fits-all' statistical range." Id. at 1231.
We reach the same conclusion here. On the record before us, we conclude that Alexander's sweeping opinion that this accident could not have caused these injuries to this plaintiff is not reasonably and reliably supported by the seventeen studies. The record does not establish that experts in the field "accept the soundness of the methodology, including the reasonableness of relying on this type of underlying data and information." Rubanick, supra, 125 N.J. at 451, 593 A.2d 733. And, the record does not establish the existence of a sufficient data base of subjects with characteristics similar to plaintiff (gender, age, pre-existing condition, and head position) to support scientific reliability.
Nor has Alexander supported his opinion by reference to his unspecified research. Without establishing that the research pertained to the structures of the spine implicated in this case, and explaining the methodology and results of the research, his opinion, to the extent it rests on that basis, is a net opinion. Experts must "identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are scientifically reliable." Landrigan, supra, 127 N.J. at 417, 605 A.2d 1079. The function of a court when considering whether to admit expert scientific evidence "is to distinguish scientifically sound reasoning from that of the self-validating expert, who uses scientific terminology to present unsubstantiated personal beliefs." Id. at 414, 605 A.2d 1079; see also Suanez, supra, 353 N.J.Super. at 201, 801 A.2d 1186 ("A court should not admit a purported scientific opinion `that is connected to existing data only by the ipse dixit of the expert.'") (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 519, 139 L.Ed.2d 508, 519 (1997)).
Although not argued in the trial court, defendant argues on appeal that the admissibility of Alexander's opinion was also established by the third allowable method, persuasive judicial opinions. In Suanez, supra, 353 N.J.Super. at 201-02, 801 A.2d 1186, we noted that decisions of the courts of other jurisdictions found "no reliable scientific foundation in bio-mechanical studies for an expert opinion that a low-impact automobile accident cannot cause a herniated lumbar disc or other serious injury." Defendant has brought to our attention six additional cases and we have considered two others of our own accord. We find none of the cases a persuasive authority for allowing biomechanical engineering expert testimony that the low-impact collision in this case could not have caused plaintiff's injuries. Forrest v. Beloit Corp., 424 F.3d 344, 353 (3d Cir.2005) (biomechanical engineering testimony allowed on issue of whether a guard on machinery could have prevented accident; not relevant to issue before us); Eskin v. Carden, supra, 842 A.2d at 1228-30 (although potentially admissible in some circumstances, biomechanical engineering testimony properly excluded with respect to a plaintiff with prior back injury); D'Angelo v. Orkin Extermination Co., 826 So.2d 413, 413-14 (Fla.Dist.Ct.App.2002) (admissibility of biomechanical engineer's testimony not an issue on appeal; its purpose was to contradict the plaintiff's contention *1078 that he was thrown forward, not backward, in vehicular accident allegedly causing rotator cuff injury); Baerwald v. Flores, 122 N.M. 679, 930 P.2d 816, 820 (Ct.App.1996) (biomechanical engineer permitted to testify that temporomandibular joint injury was unlikely to result from collision such as occurred in that case), cert. denied, 122 N.M. 589, 929 P.2d 981 (1997); Valentine v. Grossman, 283 A.D.2d 571, 724 N.Y.S.2d 504, 505-06 (2001) (trial court's exclusion on relevancy grounds of proffered biomechanical engineering testimony that the forces generated in the vehicular accident were insufficient to cause a herniated disc was reversed by appellate court; the plaintiff was male, the opinion does not reveal his age, pre-accident condition, or position at impact, nor does the opinion describe the studies on which the expert relied; because of the procedural posture of the case the specific opinion that might be admitted at trial, e.g., whether in general terms and based on probabilities, or whether specific to that plaintiff and in terms of impossibility, is not known); Daddona v. Thind, 891 A.2d 786, 808-09 (Pa.Commw.Ct.2006) (the appeal issue was whether the biomechanical engineering expert was allowed to testify beyond the scope of his report; there was no challenge to the scientific reliability of his opinion); Wilson v. Rivers, 357 S.C. 447, 593 S.E.2d 603, 606 (2004) (the biomechanical expert was also a medical doctor, and the Court held that he "was qualified to render an opinion [as a biomechanical engineer] on the forces created by an impact and on the general effects on the human body caused by such forces and, because [he] is a medical doctor, an opinion regarding the cause of respondent's particular medical problems."); Ma`ele v. Arrington, 111 Wash.App. 557, 45 P.3d 557, 560-61 (2002) (biomechanical engineer permitted to testify generally about the forces involved in low speed collisions and that injury would not be expected in a collision such as occurred in that case).
In light of our disposition, we need not address plaintiff's appeal arguments that the trial judge erred in denying her a new trial or ordering additur, or that the jury's finding of no permanent injury caused by the accident was against the weight of the evidence. Likewise we need not address plaintiff's argument that the trial judge erred in admitting the testimony of defendant's accident reconstruction expert, and we leave to the trial judge's discretion whether to admit such testimony on retrial, considering its relevance in connection with such other evidence that is admitted.
Finally, we comment on plaintiff's argument that she was denied a fair trial because of the trial judge's failure to timely rule on her in limine motion to bar evidence of a subsequent accident in which she was involved on January 5, 2002. That accident occurred only days before a new round of MRIs were performed, which had been scheduled before January 5, 2002. There was no medical evidence to suggest that any of plaintiff's claimed injuries from the March 2, 1998 accident were caused or contributed to by that later accident. Because the trial judge had just been assigned the case for trial, he was not sufficiently familiar with it to rule on the motion at the commencement of trial. He directed counsel to refrain from mentioning it until he ruled. A subsequent request by plaintiff's counsel for a ruling was declined. Plaintiff's counsel made a strategic decision to preemptively elicit in his questioning of a medical witness that plaintiff was involved in the later accident rather than risk a negative jury reaction for appearing to conceal information if the ultimate ruling was adverse. The defense seized upon the door thus opened and repeatedly referred to the later accident. Plaintiff never objected.
*1079 We find no fault with the trial judge deferring his ruling on this issue until he received sufficient information to make an informed decision. Plaintiff's counsel should have pressed for a ruling before taking the matter into his own hands, and for this reason we would not find reversible error in this regard. That said, on retrial, in the absence of any medical testimony to causally relate plaintiff's claimed injuries to the later accident, evidence of that accident should be barred.
Reversed and remanded for a new trial.
NOTES
[1] Plaintiff also claimed other injuries caused by the accident, including carpal tunnel syndrome and ulnar neuropathy. Our analysis does not necessitate discussion of these injury claims.
[2] Plaintiff obtained partial summary judgment on liability. Plaintiff's husband's per quod claim and the claim against GMAC were voluntarily dismissed prior to trial.
[3] When questioned about her head position, plaintiff's attorney asked, "If you're looking at me, and I'm 12 o'clock right now, and I'm 12 o'clock on the dial . . . [a]pproximately where was your head facing at the time of the impact?" Plaintiff responded: "I would say 10:30."