942 A.2d 769

HAJRIE HISENAJ, PLAINTIFF–RESPONDENT, AND BINAK HI-
SENAJ, HER HUSBAND, PLAINTIFF, v. AMANDA L. KUEH-
NER, DEFENDANT–APPELLANT, AND GMAC, JOHN DOE I
THROUGH JOHN DOE X (BEING FICTITIOUS) AND ABC COR-
PORATION THROUGH XYZ CORPORATION (BEING FICTI-
TIOUS), DEFENDANTS.

Argued November 13, 2007—Decided March 6, 2008.

*Michael B. Devins* argued the cause for appellant (*McElroy, Deutsch, Mulvaney & Carpenter,* attorneys; *Mr. Devins, Walter*

*R. Krzastek, Jr., Lisa E. Lomelo and Patrick J. Farmer III*, on the briefs).

*Michelle Joy Munsat* argued the cause for respondent.

*Bruce H. Stern* argued the cause for amicus curiae Association of Trial Lawyers of America–New Jersey (*Stark & Stark*, attorneys).

*Stephen J. Foley, Jr.*, submitted a brief on behalf of amicus curiae New Jersey Defense Association (*Campbell, Foley, Lee, Murphy & Cernigliaro*, attorneys).

Justice LaVECCHIA delivered the opinion for the Court.

The issue in this appeal arose out of the trial of a personal-injury action for injuries sustained in an automobile accident. The jury's verdict was largely in favor of defendant, and plaintiff appealed. A panel of the Appellate Division reversed and held that plaintiff was entitled to a new trial because the trial court erred in admitting expert testimony from defendant's biomechanical engineer. *Hisenaj v. Kuehner*, 387 *N.J.Super.* 262, 277, 903 *A.*2d 1068 (App.Div.2006). We granted defendant's petition for certification, 189 *N.J.* 427, 915 *A.*2d 1050 (2007), and now reverse. Based on the record and arguments presented to the trial court, and applying the abuse-of-discretion standard, we hold that the trial court's evidential ruling was within the range of sustainable trial determinations that the reviewing court should have affirmed.

I.

A.

The instant case involves a low-impact, vehicle-on-vehicle collision that occurred at the intersection of River Road and Drakestown Road in Mount Olive on March 2, 1998. Plaintiff, Hajrie Hisenaj, a forty-year-old woman, had stopped at the intersection and was preparing to turn left. Defendant Amanda Kuehner was driving toward the intersection and initially failed to notice plaintiff's vehicle. Suddenly aware of the threat of an impending

collision, defendant applied her brakes. But her reaction came too late. Her vehicle collided with the rear bumper of plaintiff's vehicle.

Defendant nonetheless succeeded in substantially slowing her vehicle prior to the accident. At impact, defendant's car was traveling at less than eight miles per hour, and the collision resulted in less than a five-mile-per-hour change in the velocity of plaintiff's car. An accident re-constructionist later likened the impact to that felt by riders in colliding amusement park bumper cars.

Plaintiff began experiencing chronic pain in her neck and lower back soon after the accident. She consulted a multitude of medical practitioners to address her discomfort. Imaging of her back revealed degenerative disc disease (DDD),[1] as well as herniated and bulging discs, in the cervical and lumbar portions of her spine.[2] After four years of non-invasive treatments failed to alleviate her cervical and lumbar back pain, plaintiff resorted to surgical treatment.

In 2000, plaintiff filed the instant action claiming that the 1998 accident caused the herniated discs in her cervical and lumbar spine.[3] Because summary judgment resolved liability in plaintiff's favor, the trial focused on damages. Plaintiff asserted that the accident caused a "permanent consequential limitation of use of a

---

[1] Degenerative disc disease is a "protrusion, herniation, or fragmentation of an invertebral disc beyond its borders with potential compression of a nerve root, the cauda equine in the lumbar region, or the spinal cord at higher levels." *Stedman's Medical Dictionary for the Health Professions and Nursing* 385 (5th ed.2005).

[2] Plaintiff underwent MRIs on her cervical and lumbar spine in 1998 and 2002. The parties agree that the MRIs show that plaintiff suffered mild degenerative disc disease in her cervical and lumbar spine. The jury heard conflicting expert testimony as to whether the MRIs revealed herniations in plaintiff's cervical and lumbar spine.

[3] Plaintiff also claimed other injuries from the accident, none of which are implicated in this appeal.

body organ or member," and a "significant limitation of use of a body function or system," which allowed her to pursue this tort cause of action against defendant. *See N.J.S.A.* 39:6A–8(a) (1990) (amended 1998 and 2003) (establishing then-extant verbal threshold requirement for negligence cause of action to proceed); *Oswin v. Shaw,* 129 *N.J.* 290, 315, 609 *A.*2d 415 (1992). Both plaintiff and defendant produced expert testimony on the disputed issues of causation and permanency of injury.

The jury found that the accident resulted in a "significant limitation of use of a body function or system," [4] but that plaintiff did not suffer a permanent injury as a result of the collision. In its review of this matter on appeal, the Appellate Division remarked, "The jury apparently found that the accident caused plaintiff's pre-existing [DDD] to become symptomatic and painful for a time, but it did not cause any herniations or other permanent injuries." *Hisenaj, supra,* 387 *N.J.Super.* at 266, 903 *A.*2d 1068. That said, the Appellate Division reversed and ordered a new trial, finding that the trial court committed reversible error in admitting expert testimony from defendant's biomechanical engineer, Harold Alexander, Ph.D. *Id.* at 275, 903 *A.*2d 1068.

The narrow issue in this appeal is whether the Appellate Division overstepped its bounds when reviewing the trial court's admission of Dr. Alexander's expert testimony. In reviewing a trial court's evidential ruling, an appellate court is limited to examining the decision for abuse of discretion. *See Brenman v. Demello,* 191 *N.J.* 18, 31, 921 *A.*2d 1110 (2007). A reviewing court is not permitted to create anew the record on which the trial court's admissibility determination was based. *See ibid.* Defendant claims that instead of adhering to the proper scope of review, the Appellate Division essentially undertook its own examination of the foundation for Dr. Alexander's testimony and erroneously substituted its judgment for that of the trial court. And, further, in doing so, the panel effectively allowed plaintiff to create a whole

---

[4] The jury awarded plaintiff $50,000 for that injury.

new case against the admissibility of Dr. Alexander's testimony than that which was presented to the trial court.

We begin our analysis, therefore, by turning to the record and arguments that were presented to the trial court.

## B.

The expert testimony on biomechanics [5] from Dr. Alexander was to be a central component in defendant's response to plaintiff's medical experts (all of whom opined that the 1998 low-impact collision caused plaintiff to suffer a permanent injury).[6] In proffering her expert's testimony, defendant indicated that Dr. Alexander would testify that the minimal velocity of defendant's vehicle at impact, coupled with the minor change in the velocity of plaintiff's car resulting from the crash, made it "highly improbable" that the rear-end collision caused the herniations in plaintiff's cervical and lumbar spine. According to Dr. Alexander, given the circumstances of the low-impact collision, no biomechanical "mechanism" existed that would cause a chronic injury to result from this impact. He therefore opined that it was highly improbable

---

[5] As explained by those in the field, biomechanics at its simplest is "mechanics applied to biology." Y.C. Fung, *Biomechanics: Mechanical Properties of Living Tissues* 1, 6 (2d ed.1993). *See generally* Ghassan S. Kassab, *Y.C. "Bert" Fung: The Father of Modern Biomechanics*, 1 Tech Sci. Press 5 (2004) (describing Dr. Fung's contributions to field of biomechanics). It has been asserted that mechanics can be "applied to the analysis of any dynamic system." *Fung, supra,* at 1. Mechanics focuses on forces, motions, and strengths of materials, and "has been extended to cover the study of the motions of all kinds of particles and continua, including quanta, atoms, molecules, gases, liquids, solids, structures, stars, and galaxies." *Ibid.* When an outside force acts upon a living being, the biomechanical engineer applies concepts of mechanics to explain the physiological effects of that force acting upon a living being, and specifically how that force likely would affect "the normal functions of [that being] or [its] organs." *Id.* at 6.

[6] Defendant also produced an accident re-constructionist who testified to the impact of the collision, and two medical experts who opined that plaintiff's neck and back pain most likely resulted from the natural progression of plaintiff's DDD, not from the 1998 collision.

that plaintiff suffered a chronic injury from an accident such as the collision with defendant's vehicle.

Dr. Alexander partially based his opinion on a review of the record as to the accident and plaintiff's medical history. He relied on (1) police reports relating to the accident; (2) the parties' depositions and answers to interrogatories; (3) photographs of defendant's vehicle; (4) the property damage file from plaintiff's insurance company; (5) plaintiff's medical records; and (6) the report and testimony of defendant's accident re-constructionist regarding the velocity of defendant's vehicle at impact and the change in velocity to plaintiff's vehicle caused by the collision (the Delta–V opinion testimony). Dr. Alexander also reviewed seventeen scholarly analyses of studies that measured the effects of low-impact collisions on humans of various ages, and physical and mental make-ups. He appended those studies to his expert report.

Plaintiff moved *in limine* to exclude Dr. Alexander's testimony, alleging that the threshold requirements for admissibility under *Evidence Rule* 702 were not met because there was not a reliable scientific foundation for the opinion testimony. Plaintiff further objected to Dr. Alexander's reliance, when forming his expert opinion, on the opinion of the accident re-constructionist concerning the Delta–V involved in this accident. In respect of the latter criticism, plaintiff also argued that Alexander's opinion constituted a net opinion. After conducting a *Rule* 104 hearing, the trial court admitted Dr. Alexander's proffered testimony. Dr. Alexander's direct testimony at trial essentially followed the proffer. On appeal, plaintiff reasserted that Dr. Alexander's opinions did not have the requisite reliable scientific foundation needed to satisfy *Evidence Rule* 702's admissibility requirements and that, therefore, the trial court erred in admitting that testimony. *Hisenaj, supra,* 387 *N.J.Super.* at 264, 903 *A.2d* 1068.

The Appellate Division directed the parties to submit the studies on which Dr. Alexander relied, which had not been moved into evidence, and to file briefs re-addressing whether Dr. Alexander's

testimony met the threshold requirements for admissibility under *Rule* 702. *Id.* at 272, 903 *A.*2d 1068. The panel engaged in its own review of the bases for Dr. Alexander's expert testimony and concluded that the testimony did not rest on a scientifically reliable foundation. *Id.* at 273–75, 903 *A.*2d 1068. The panel found that although biomechanical engineers could testify to the effects that usually follow from involvement in a low-impact vehicular collision, the field was not sufficiently accurate and reliable for biomechanical engineers to offer opinions about the likely effects that would flow to a particular individual involved in a low-impact vehicular collision. *Id.* at 274, 903 *A.*2d 1068. Accordingly, the panel vacated the trial verdict and remanded for a new trial. *Id.* at 277, 903 *A.*2d 1068.

## II.

In assessing whether the trial court erred in admitting Dr. Alexander's expert testimony, we must examine the testimony and evidence developed in the record under review. *See Mogull v. CB Commercial Real Estate Group,* 162 *N.J.* 449, 475–76, 744 *A.*2d 1186 (2000); *Persley v. N.J. Transit Bus Operations,* 357 *N.J.Super.* 1, 10, 813 *A.*2d 1219 (App.Div.), *certif. denied,* 177 *N.J.* 490, 828 *A.*2d 918 (2003). The admissibility of Dr. Alexander's expert testimony was governed by *N.J.R.E.* 702:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

The *Rule* has three well-known prerequisites: (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony. *See Brenman, supra,* 191 *N.J.* at 31–32, 921 *A.*2d 1110 (citing *State v. Torres,* 183 *N.J.* 554, 567–68, 874 *A.*2d 1084 (2005)). The burden of proving that the testimony satisfies those threshold requirements rests with the party proffering the testimony. *See State v. Harvey,* 151 *N.J.* 117, 167, 699

*A.*2d 596 (1997), *cert. denied,* 528 *U.S.* 1085, 120 *S.Ct.* 811, 145 *L.Ed.*2d 683 (2000).

 It falls to the parties at trial, who are positioned best to gather and analyze the viability of an expert's proffered testimony, to highlight the strengths and shortcomings of the foundation for that testimony so that the trial court can reach an informed admissibility decision. *See, e.g., Beadling v. William Bowman Assocs.,* 355 *N.J.Super.* 70, 88, 809 *A.*2d 188 (App.Div.2002) (limiting review of trial court's admission of expert testimony to record developed at trial); *Cowan v. Doering,* 215 *N.J.Super.* 484, 496, 522 *A.*2d 444 (App.Div.1987) (same), *aff'd,* 111 *N.J.* 451, 545 *A.*2d 159 (1988). Trial courts are experts in the field of law. Although trial courts are expected to act as gatekeepers to the proper admission of expert testimony, we do not expect courts to investigate *sua sponte* the extent to which the scientific community holds in esteem the particular analytical writings or research that a proponent of testimony advances as foundational to an expert opinion. *See Rubanick v. Witco Chem. Corp.,* 125 *N.J.* 421, 451, 593 *A.*2d 733 (1991) ("We do not believe that in determining the soundness of the methodology the trial court should directly and independently determine as a matter of law that a controversial and complex scientific methodology is sound."). The trial court's review, therefore, is as broad as the breadth of the proffer and the challenges thereto that the parties present. And, an abuse-of-discretion standard of review applies to the resultant admissibility determination made by the trial court. *See Carey v. Lovett,* 132 *N.J.* 44, 64, 622 *A.*2d 1279 (1993) (recognizing that trial court's admissibility determinations usually reviewed for abuse of discretion); *Little Egg Harbor Twp. v. Bonsangue,* 316 *N.J.Super.* 271, 278, 720 *A.*2d 369 (App.Div.1998) (same).

## III.

### A.

During the *Rule* 104 hearing, plaintiff conceded that Dr. Alexander's testimony satisfied the first prong of *Rule* 702. Knowledge

of biomechanical engineering plainly is beyond the ken of the average juror. *See, e.g., Crispin v. Volkswagenwerk AG*, 248 *N.J.Super.* 540, 549, 591 *A.*2d 966 (App.Div.) (admitting expert testimony from biomechanical engineer on injuries that would have occurred had safety belt been worn by plaintiff), *certif. denied*, 126 *N.J.* 385, 599 *A.*2d 162 (1991). Plaintiff further conceded that Dr. Alexander possessed the requisite qualifications to testify as an expert in the field of biomechanical engineering. Only prong (2)—the scientific–reliability requirement—was in dispute.

Scientific reliability of an area of research or expertise may be established in one of three ways. *Torres, supra*, 183 *N.J.* at 568–69, 874 *A.*2d 1084. When an expert in a particular field testifies that the scientific community in that field accepts as reliable the foundational bases of the expert's opinion, reliability may be demonstrated. *See State v. Kelly*, 97 *N.J.* 178, 210, 478 *A.*2d 364 (1984). Scientific literature also can evidence reliability where that "literature reveals a consensus of acceptance regarding a technology." *Harvey, supra*, 151 *N.J.* at 174, 699 *A.*2d 596. So long as "comparable experts [in the field] accept the soundness of the methodology, including the reasonableness of relying on [the] underlying data and information," reliability may be established. *Rubanick, supra*, 125 *N.J.* at 451, 593 *A.*2d 733. Finally, a party proffering expert testimony may demonstrate reliability by pointing to existing judicial decisions that announce that particular evidence or testimony is generally accepted in the scientific community. *See Kelly, supra*, 97 *N.J.* at 210, 478 *A.*2d 364.

### B.

The reliability of Dr. Alexander's testimony hinged on his extrapolation from findings in seventeen discrete biomechanical engineering studies of persons involved in low-impact vehicular collisions. Dr. Alexander applied those studies in forming an opinion about the probability that chronic injury would result from a low-impact vehicular collision in a case that involved a forty-

year-old woman, suffering from asymptomatic degenerative disc disease. Dr. Alexander opined that it was "highly improbable" that plaintiff would suffer a chronic injury as a result of the low-impact collision with defendant because no biomechanical "mechanism" for chronic injury existed under the circumstances.

During the *Rule* 104 hearing, and later at trial, plaintiff attacked Dr. Alexander's testimony by focusing only on whether those seventeen studies provided a reliable scientific foundation for his opinion. No broad challenge to the general admissibility of biomechanical engineering testimony in low-impact-collision cases was advanced before the trial court. Therefore, no such broad challenge to biomechanical engineering expert testimony was before the Appellate Division. *See, e.g., Verni ex rel. Burstein v. Harry M. Stevens, Inc.,* 387 *N.J.Super.* 160, 215, 903 *A.*2d 475 (App.Div.2006) ("[The] issue was not raised at trial. We decline to address the issue [on] appeal."), *certif. denied,* 189 *N.J.* 429, 915 *A.*2d 1052 (2007); *Rutgers, State Univ. of N.J. v. Liberty Mut. Ins. Co.,* 277 *N.J.Super.* 571, 581, 649 *A.*2d 1362 (App.Div.1994) (declining to address issue not briefed at trial level). Rather, the parties' arguments centered solely on whether the seventeen studies constituted a reliable foundation from which Dr. Alexander could extrapolate an opinion about the likely biomechanical engineering aspects of plaintiff's accident. Plaintiff specifically relied on the Appellate Division decision in *Suanez v. Egeland,* 353 *N.J.Super.* 191, 801 *A.*2d 1186 (App.Div.2002), when contending that Dr. Alexander failed to provide a reliable scientific basis for his opinions.

In *Suanez,* the plaintiff, a middle-aged woman, was a passenger in a vehicle that was struck in the rear by a vehicle driven by the defendant. *Id.* at 194, 801 *A.*2d 1186. At a trial on the issue of damages, the defendant relied on expert testimony from a biomechanical engineer. *Ibid.* That expert sought to testify that the low-impact accident resulted in only a five-mile-per-hour change in velocity (Delta–V) of the plaintiff's vehicle, and that that Delta–V could not have caused the plaintiff's herniated lumbar disc. *Ibid.*

The trial court declined to conduct a *Rule* 104 hearing, and held that the expert's testimony was admissible. *Ibid.* The jury returned a verdict in the defendant's favor, concluding that the plaintiff failed to overcome the then-extant verbal threshold. *Id.* at 195, 801 *A.*2d 1186.

The *Suanez* plaintiff argued on appeal that the defendant failed to establish the requisite scientific basis for the biomechanical engineering expert's opinions. *Ibid.* Initially, the *Suanez* panel noted that the trial court should have undertaken a *Rule* 104 hearing that "would have afforded the parties and the court an opportunity to explore fully the purported scientific bases of [the expert's] opinions." *Ibid.* The panel did not remand the matter, however, because the parties "had an adequate opportunity to present evidence relevant to [the] issue" when the expert testified. *Ibid.* Based on that testimony, the panel concluded that the expert neither had comprehensive training in anatomy, physiology, or pathology, nor had "conducted or observed tests of low-impact collisions on humans." *Id.* at 196, 801 *A.*2d 1186. Rather, the expert's "knowledge on the subject [was] derived solely from literature in the field," and the admissibility determination therefore depended on whether that literature provided a reliable scientific foundation for the expert's opinions. *Ibid.*

The *Suanez* panel set forth substantial passages from the expert's trial testimony in which the expert spoke generally about the literature on which his opinions relied "in very broad and general terms." *Id.* at 196–200, 801 *A.*2d 1186. That literature purportedly discussed tests "performed either upon cadavers or upon military personnel under controlled conditions quite dissimilar from an automobile accident" involving a middle-aged, female civilian. *Id.* at 200, 801 *A.*2d 1186. Further, there was no indication that the scientific community viewed the studies on which the expert relied as a reliable means to draw conclusions concerning the effects of a low-impact automobile collision on a middle-aged woman. *Id.* at 200–01, 801 *A.*2d 1186. Therefore,

the panel concluded that the trial court erred in admitting the expert's testimony. *Id.* at 203, 801 *A.*2d 1186.

The record in the present case stands in contrast to that in *Suanez.* The trial court held a *Rule* 104 hearing and dedicated a substantial portion of its hearing to addressing *Suanez.* Unlike the expert in *Suanez,* Dr. Alexander's opinion was not based solely on having read alleged scholarly research abstractly discussing potential results of low-impact accidents. Dr. Alexander instead based his opinion on actual studies that had examined the outcomes of low-impact accidents on individuals of both genders and of various ages and body types. Plaintiff advanced no evidential basis for discrediting those studies during the *Rule* 104 hearing. Indeed, plaintiff did not provide any support for counsel's bald assertion that the studies lacked scientific reliability. At trial, plaintiff's argument turned into a form of net opinion challenge. Plaintiff's one question challenging the studies focused on the asserted deficiency that they did not include among their subjects a woman of plaintiff's age, with DDD. Based on that meager record made before the trial court, we are persuaded that the court's admissibility determination did not constitute an abuse of discretion. *See, e.g., Torres, supra,* 183 *N.J.* at 572, 874 *A.*2d 1084 (noting that abuse of discretion only arises on demonstration of "manifest error or injustice").

According to Dr. Alexander's testimony, the seventeen studies were performed over a period of thirty-four years on more than two hundred test subjects. Test subjects were exposed to simulated rear-end collisions involving Delta–V speeds between 2.5 and 8.0 miles per hour. At least fifty-two test subjects were women, ranging in age from young to old. As noted by Dr. Alexander, the studies allowed for subjects with DDD. He emphasized one study that involved a fifty-eight-year-old woman, and explained that all individuals at that age suffer from some degree of DDD, though it usually is asymptomatic. Importantly for purposes of Dr. Alexander's formulation of his opinion testimony,

the studies showed that, of the two hundred test subjects, none suffered chronic spinal injuries as a result of the collisions.

As compared to *Suanez*, there was in this case a closer nexus between plaintiff's injuries and the type of injuries addressed in the studies on which Dr. Alexander relied. The *Suanez* expert rendered an opinion about the effect of a low-impact vehicular collision on a middle-aged woman, relying solely on unspecified impact studies that were described as having employed cadavers and military personnel as subjects. The studies that Dr. Alexander identified involved tests conducted on a range of volunteer civilians, involved actual vehicular collisions, and included some subjects who were similar to plaintiff in age, gender, and physical composition. Dr. Alexander explicitly pointed to such features as adding to the value of the studies.

> We are dealing here with probability. We're not dealing with absolutes. We have, admittedly, a complicated situation. We have a vehicle that's hit from behind, and we have a pretty good idea of what the Delta V of that vehicle is, as a result of that collision. And we also know that the forces associated with that get translated through the frame of the vehicle, through the supports of the seat, through the seats themselves, and eventually to the individual in the vehicle, and it provides certain forces to that individual. It's a fairly complex situation, and it varies from vehicle to vehicle, to the stiffness in the vehicle. So there are averages here, there's a range. So, therefore, the value of 34 years of experimentation with over 200 people, just tells us that if you look [at] a whole range of individuals, old, young, men, women, and we expose them to this kind of situation, and not one of them, in 34 years ends, up with a chronic injury, it's highly improbable that one would sustain a chronic injury from this kind of collision. That's basically what my opinion is.

As noted, plaintiff argued that Dr. Alexander's reliance on the studies was flawed because the studies did not include a forty-one–year–old woman with asymptomatic degenerative disc disease involved in a collision with a Delta–V under five miles per hour. According to plaintiff, an expert would be required to rely on a study that precisely mirrored the type of injury sustained by a similarly featured plaintiff before a court could admit the testimony of an expert who relied on such testing and related scientific literature as a basis for the opinion. That position is clearly inconsistent with existing law, however. *See Clark v. Safety–Kleen Corp.*, 179 *N.J.* 318, 338, 845 *A.*2d 587 (2004) (recognizing

that identical data in scientific testing is not prerequisite to admission of expert testimony).

Moreover, Dr. Alexander based his testimony on additional grounds that were advanced before the trial court as supporting that the scientific community accepted the reliability of the seventeen studies. The *Rule* 104 hearing yielded the following exchange:

[THE COURT]: Do you recognize [the authors of the studies on which Dr. Alexander was relying] as authorities in the field? I mean, are these authors known to you in any way? I don't mean personally known, but—

[DR. ALEXANDER]: Not personally known, but many of them are well published in the field, yes.

[THE COURT]: And do you recognize them as authorities in their respective fields?

[DR. ALEXANDER]: I would say so, yes.

Although the appellate panel found that Dr. Alexander's testimony relayed only his personal views about the reliability of the studies, and not how the scientific community at large regarded the studies, *Hisenaj, supra,* 387 *N.J.Super.* at 271–72, 903 *A.*2d 1068, Dr. Alexander's testimony actually provided the trial court with more information than the appellate panel credited. Plainly, Dr. Alexander structured his testimony in response to the phraseology of the question posed when he affirmed the studies' authoritativeness. But, he also stated that he relied on what he referred to as the "rich literature" that was "well published in the field." Individual studies had been published by a number of organizations, including two major universities, and some have been peer reviewed in journals including the *Archives of Physical Medicine and Rehabilitation, SPINE,* and *Accident Analysis and Prevention.* Another comprised a chapter from a larger work concerning biomechanics and low-impact vehicular collisions. Publication itself, although not necessarily dispositive of general acceptance in the scientific community, does provide additional evidence of acceptance. *Cf. State v. Marcus,* 294 *N.J.Super.* 267, 287, 683 *A.*2d 221 (App.Div.1996) (recognizing that general acceptance only "require[s] that the scientific technique or procedure be accepted as scientifically reliable, not that it produce results which are beyond

all legitimate debate"), *certif. denied,* 157 *N.J.* 543, 724 *A.*2d 803 (1998).

Dr. Alexander's testimony should have prompted the offering of contrary evidence to support plaintiff's claim that the studies were not accepted generally in the scientific community. However, no expert testimony or other form of support was presented to the trial court to show that the studies, or their methodological underpinnings, were unsound or disfavored by the scientific community. Plaintiff's argument criticized the studies, claiming that they are unreliable because they do not include a significant number of test subjects that matched plaintiff's age and physical characteristics. However, no support was offered for that argument. That absence was noted by the trial court, which stated,

> You have had this literature, I assume, for some period of time.... Every one of these articles could have been looked up. Maybe you did, maybe you didn't, and to the extent that, you know, the group tested is absolutely inapplicable to what we're dealing with here. If you've done that work, I'm sure you'll show it, or if you can develop it while you're cross-examining Dr. Alexander, I'm sure you'll show it.

In sum, plaintiff's attack on the admissibility of Dr. Alexander's testimony during the *Rule* 104 hearing fizzled. Despite the court's invitation to plaintiff to augment her challenge in respect of the studies during cross-examination of Dr. Alexander at trial, plaintiff asked only one question about the studies used in this matter when cross-examining him.

For completeness we note that, on appeal, plaintiff pursued the argument that Dr. Alexander's testimony constituted a net opinion because it relied exclusively on the change in velocity to plaintiff's vehicle caused by the collision, ignoring a multitude of other factors that would contribute to determining whether the accident could result in a chronic injury. Those points were brought out during Alexander's cross-examination and properly went to the weight to be accorded this testimony by the jury. However, plaintiff argued that the trial court erred in not excluding the testimony as net opinion testimony when the *Rule* 104 hearing concluded.

As to that argument, we note first and foremost that this was not a net opinion. *See N.J.R.E.* 703 (requiring that experts' opinions be founded on "facts or data"); *State v. Townsend,* 186 *N.J.* 473, 494, 897 *A.*2d 316 (2006) (stating that net opinion rule requires expert to provide " 'the why and wherefore of his or her opinion, rather than a mere conclusion' " (quoting *Rosenberg v. Tavorath,* 352 *N.J.Super.* 385, 401, 800 *A.*2d 216 (App.Div.2002))). Dr. Alexander had studies on which he relied in forming his opinion, as well as facts that related to that opinion. *See, e.g., State v. Freeman,* 223 *N.J.Super.* 92, 116, 538 *A.*2d 371 (App.Div. 1988) (holding that medical-opinion testimony concerning cause of injury is not inadmissible simply "because it fails to account for some particular condition or fact which the adversary considers relevant," provided that expert offers some sufficient reasons to support opinion), *certif. denied,* 114 *N.J.* 525, 555 *A.*2d 637 (1989).

Furthermore, *Rule* 104 hearings are intended to determine admissibility, not credibility. *See Lanzet v. Greenberg,* 126 *N.J.* 168, 186, 594 *A.*2d 1309 (1991) (recognizing that after competency of expert witness has been established, "the jury is 'to determine the credibility, weight and probative value of the expert's testimony' " (quoting *James v. City of E. Orange,* 246 *N.J.Super.* 554, 563, 588 *A.*2d 412 (App.Div.1991))). The trial court did not abuse its discretion by not rejecting the testimony, at the conclusion of the *Rule* 104 hearing, on net opinion grounds. Plaintiff was free to pursue that deficiency in the expert's testimony on cross-examination, and did, but there was no further motion made to the trial court to exclude Dr. Alexander's testimony. Thus, this particular criticism of Dr. Alexander's opinion factored into the weight that the jury determined to afford to the expert's testimony.

That said, we recognize that the relationship between the studies and literature on which Dr. Alexander relied and Dr. Alexander's opinions in this matter could be attacked as tenuous. The appellate panel highlighted several potential flaws in Dr. Alexander's reliance on the seventeen studies when extrapolating opinions concerning plaintiff's injuries. *Hisenaj, supra,* 387 *N.J.Su-*

*per.* at 271–76, 903 *A.*2d 1068. Those flaws, if developed in a trial record, might convince a trial court to exclude expert testimony from a biomechanical engineer concerning the likely injuries that a particular plaintiff would suffer as a result of a low-impact, vehicle-on-vehicle collision. However, we are compelled to restrict ourselves to the record made before the trial court. The Appellate Division did not do so. It engaged in an unconstrained review that included material not part of the evidentiary record and argument that went beyond that which was advanced before the trial court. That resulted in avoidance of the reviewing court's proper role, the application of the abuse-of-discretion standard. Under the circumstances of the present admissibility issue as litigated before the trial court, neither the Appellate Division nor this Court should rehabilitate the record against admissibility that was presented at trial.

To summarize, we find no basis in this record on which to conclude that the trial court must be reversed for having found that Dr. Alexander had an adequately reliable scientific foundation from which to extrapolate an opinion in this matter. The trial court's decision to admit Dr. Alexander's testimony was not so "wide of the mark" as to constitute "a manifest denial of justice" and an abuse of discretion. *State v. Wakefield,* 190 *N.J.* 397, 435, 921 *A.*2d 954 (2007); *Verdicchio v. Ricca,* 179 *N.J.* 1, 34, 843 *A.*2d 1042 (2004). In light of the deference afforded to trial courts' admissibility determinations and *Rule* 702's tilt in favor of admissibility, *State v. Berry,* 140 *N.J.* 280, 290–93, 658 *A.*2d 702 (1995), we hold that the appellate panel erred in reversing the judgment of the trial court.

## IV.

The judgment of the Appellate Division is reversed. The matter is remanded to the Appellate Division for consideration of plaintiff's unresolved appellate issues.[7]

---

[7] Because of its disposition, the Appellate Division expressly did not reach "plaintiff's appeal arguments that the trial judge erred in denying her a new trial

*For reversal and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS—7.

*Opposed*—None.

---

or ordering additur, or that the jury's finding of no permanent injury caused by the accident was against the weight of the evidence." *Hisenaj, supra,* 387 *N.J.Super.* at 277, 903 *A.2d* 1068. On remand, the panel will have to dispose of those arguments and any other unaddressed issues.