**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5140-16T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

GREGORY OLIVER,

     Defendant-Appellant.

_____

> Submitted October 28, 2019 – Decided  February 18, 2020
>
> Before Judges Fasciale and Moynihan.
>
> On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 15-04-0352.
>
> Joseph E. Krakora, Public Defender, attorney for appellant (Laura B. Lasota, Assistant Deputy Public Defender, of counsel and on the brief).
>
> Camelia M. Valdes, Passaic County Prosecutor, attorney for respondent (Ali Y. Ozbek, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

After trial with codefendants, Francis Brace and Jahmad Green, defendant Gregory Oliver appeals from his conviction by jury and sentence for first-degree aggravated manslaughter of Jaleek Burroughs, N.J.S.A. 2C:11-4(a)(1), as a lesser-included offense of first-degree murder, N.J.S.A. 2C:11-3(a)(1) or (2), N.J.S.A. 2C:2-6, and N.J.S.A. 2C:2-3(d) (count one); two counts of second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (counts six and twelve); second-degree aggravated assault of Alaysia Chambers, N.J.S.A. 2C:12-1(b)(1), as a lesser-included offense of first-degree attempted murder, N.J.S.A. 2C:5-1, N.J.S.A. 2C:11-3(a), and N.J.S.A. 2C:2-3(d) (count eight); and second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count seven). Both victims were shot in an early-morning incident on August 31, 2014. The State alleged defendant and his codefendants shot at a gold Ford Taurus from which shots were also fired. Burroughs was shot in the head and pronounced dead on the sidewalk where he fell. Chambers, who was seated in Brace's BMW in which he had earlier picked her up, was also shot in the head; she survived her wound. Neither of the victims were the intended targets of the shootings.

On appeal, defendant argues:

POINT I

THE TRIAL [JUDGE] ERRED IN ADMITTING INTO EVIDENCE THE PRIOR RECORDED STATEMENTS OF A TESTIFYING WITNESS AS SUBSTANTIVE EVIDENCE PURSUANT TO N.J.R.E. 803(A)(1) AND N.J.R.E. 803 (C)(5).

POINT II

THE [TRIAL JUDGE] VIOLATED DEFENDANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY ADMITTING "EXPERT" BALLISTICS TESTIMONY THAT IS CONTRARY TO THE CURRENT STATE OF THE SCIENCE AND FEDERAL LAW AND IS THEREFORE UNRELIABLE AND INADMISSIBLE UNDER N.J.R.E. 702.

    A.    SUBJECTIVE BALLISTICS TOOLMARK EVIDENCE IS INADMISSIBLE UNDER N.J.R.E. 702 AS IT IS UNRELIABLE.

    B.    ALTERNATIVELY, THIS COURT SHOULD REMAND THE MATTER FOR A RULE 104 HEARING AS TO THE SCIENTIFIC RELIABILITY OF THIS EVIDENCE, IF ANY.

POINT III

DEFENDANT WAS DENIED THE RIGHT TO DUE PROCESS AND A FAIR TRIAL WHEN THE STATE PUBLISHED TO THE JURY A GRUESOME PHOTOGRAPH OF THE HOMICIDE VICTIM, PARTICULARLY AS THAT EXHIBIT WAS LATER RULED INADMISSIBLE UNDER N.J.R.E. 403.

POINT IV

THE SENTENCING COURT APPLIED INAPPROPRIATE AGGRAVATING FACTORS AND MISAPPLIED STATE V. YARBOUGH,[1] RESULTING IN AN AGGREGATE TWENTY-SEVEN[-]YEAR TERM, SUBJECT TO AN EIGHTY-FIVE PERCENT PAROLE DISQUALIFIER, THAT IS MANIFESTLY EXCESSIVE.

For the reasons we now discuss, we affirm.

## I.

The statements that defendant claims were wrongly admitted as substantive evidence were taken by Paterson police detectives who twice interviewed Jocelyn Suggs. Video recordings of both interviews—the first, four days after the shooting and the second on December 3, 2014—were admitted into evidence and played for the jury. In the statements, Suggs explained to the detectives that a large crowd of people had congregated in the area around a parked BMW in which Chambers sat prior to the shooting. Suggs was warned there was going to be a shooting. She placed Brace at the scene, at the side of the BMW. Someone retrieved a gun from the BMW's interior. The first shots were fired from the gold Taurus as it drove by the group gathered near the BMW. She observed Brace return fire. Suggs told detectives an individual named

---

[1] 100 N.J. 627 (1985).

Jahmad was at the scene, and she heard him state that he had a gun. Suggs also told detectives that a week or two after the shooting, she heard defendant state that he "shot him in the eyeball."

Further to the State's request to introduce the statements, the trial judge conducted a hearing to determine whether the statements were admissible under N.J.R.E. 803(a)(1). State v. Gross, 216 N.J. Super. 98, 110 (App. Div. 1987), aff'd, 121 N.J. 1 (1990); accord State v. Brown, 138 N.J. 481, 539 (1994). N.J.R.E. 803(a)(1) provides a hearsay exception for prior inconsistent statements of a witness that would have been admissible if made by the declarant while testifying. A statement is deemed inconsistent if the witness feigns a lack of recollection or recants his or her testimony. State v. Savage, 172 N.J. 374, 404-05 (2002). If the statement is offered by the party calling the witness, it is admissible as substantive evidence if it is "contained in a sound recording or in a writing made or signed by the declarant-witness in circumstances establishing its reliability[.]" N.J.R.E. 803(a)(1). The party offering the statement has the burden of proving the reliability of the prior statement by a preponderance of the evidence. Gross, 121 N.J. at 7, 15-17. The trial judge's role "is not to determine the credibility of the out-of-court statement. Rather it is for the judge to determine from the proofs whether the prior statement was made or signed

under circumstances establishing sufficient reliability that the factfinder may fairly consider it as substantive evidence." Gross, 216 N.J. Super. at 110.

Defendant advances several reasons the judge erred in finding the statements reliable: Suggs was in custody when she provided her statements to police because—during the first interview—she was told she was not free to leave until she told detectives what they wanted to hear, and because detectives arrived at her place of employment and told her they had a warrant for her arrest when they picked her up prior to the second interview; Suggs was pressured and coerced by police to give the statements; Suggs testified she was chronically intoxicated, and high on MDMA and marijuana, when both interviews took place; and there was no evidence corroborating Suggs's account of defendant's involvement in the shooting, emphasizing Suggs was the sole witness who testified to his alleged comment about shooting the victim in the eye, and no witnesses observed defendant firing a weapon, nor did any forensic evidence tie him to any of the recovered weapons.

We review the evidentiary rulings of the trial court under the abuse of discretion standard. State v. Harris, 209 N.J. 431, 439 (2012); State v. Merritt, 247 N.J. Super. 425, 434 (App. Div. 1991) (applying abuse of discretion standard to admission of prior inconsistent statements). We also defer to the

6

factual findings of the trial judge made after an evidentiary hearing, if those findings are supported by sufficient credible evidence in the record. State v. Robinson, 200 N.J. 1, 15 (2009). We further extend that deference to the trial court's "factual findings based on a video recording" in order to ensure trial courts that "have ongoing experience and expertise in fulfilling the role of factfinder," remain "'the finder of the facts,' in the absence of clear error." State v. S.S., 229 N.J. 360, 380-81 (2017) (quoting Fed. R. Civ. P. 52(a) advisory committee's note to 1985 amendment).

The judge heard testimony from Suggs and one of the detectives who conducted both interviews, and he viewed the video statements. Suggs testified: she could not remember anything about the events of August 31, 2014, besides there was a shooting; she felt pressured when she provided statements to the police; her prior statements were not accurate; and she wished to recant both statements. Suggs also testified she routinely drank and ingested "mollies" and "weed" at the time she provided the statements to police, and that she was high during both interviews. Finally, Suggs said she was not aware that either of her statements were being recorded.

The trial judge considered Suggs's contentions that she could not recall making the statements, the statements were not truthful, and she was under the

influence, but found her "lapse of memory" was feigned.[2] Thus, the judge ruled

the videotaped statements were inconsistent, <u>Savage</u>, 172 N.J. at 404-05,

meeting the threshold requirements of N.J.R.E. 803(a)(1).

The trial judge, in determining whether the statements were given "in

circumstances establishing its reliability," N.J.R.E. 803(a)(1)(A), reviewed each

of the fifteen factors enumerated in <u>Gross</u>, 216 N.J. Super. at 109-10:

> (1) the declarant's connection to and interest in the matter reported in the out-of-court statement, (2) the person or persons to whom the statement was given, (3) the place and occasion for giving the statement, (4) whether the declarant was then in custody or otherwise the target of investigation, (5) the physical and mental condition of the declarant at the time, (6) the presence or absence of other persons, (7) whether the declarant incriminated himself or sought to exculpate himself by his statement, (8) the extent to which the writing is in the declarant's hand, (9) the presence or absence, and the nature of, any interrogation, (10) whether the offered sound recording or writing contains the entirety, or only a portion or a summary, of the communication, (11) the presence or absence of any motive to fabricate, (12) the presence or absence of any express or implicit pressures, inducements or coercion for the making of the statement, (13) whether the anticipated use of the statement was apparent or made known to the declarant, (14) the inherent believability or lack of believability of the statement and (15) the presence or absence of corroborating evidence.

---

[2] Besides the judge's independent finding, defendant's counsel conceded "[i]t does appear [Suggs] was feigning."

A-5140-16T1

The judge found: as to factor one, Suggs was present at the scene of the shooting, "recognized and in court . . . identified the three defendants," and knew Chambers; as to factors two, three and six, the statements were given to two detectives in interview rooms "with regard to an investigation relating to the death of . . . Burroughs and the attempted murder of . . . Chambers[.]" The judge found those factors supported the statements' reliability.

The judge carefully considered whether Suggs was in custody or a target of the investigation, the fourth factor, noting the warrant for her arrest stemming from unpaid fines. The judge found Suggs was never handcuffed, Suggs "clearly indicated she didn't feel that she was a target or a suspect," and she was released after the statements. The judge observed Suggs's demeanor and responses to questioning during the interview and found, although she perceived she was in a "pressured environment," the totality of the circumstances "weighed in favor of . . . reliability" as to this factor.

The judge's observations of the video also informed his decision that, contrary to Suggs's testimony that she was under the influence during the statements, "[s]he appeared to be very attentive[,] . . . drew diagrams[,] [and m]ade appropriate corrections[.]" Her description of events and even her facial gestures also led the judge to determine that Suggs "had a good grasp of what[

9

was] going on" during the interviews. He determined factor five favored the statements' reliability.

The judge did not find factor seven applicable because Suggs neither incriminated nor sought to exculpate herself. He also found, in connection with the eighth and tenth factors, although the statements were not written in her hand, Suggs was clearly depicted on the videos, and except for a ten or twelve minute gap "where it was very hard, difficult for the [judge] to figure out what was being said,"[3] the balance of the sound recording was admissible.

The judge devoted considerable attention to factor nine, ultimately finding the factor favored a finding of reliability. The judge found Suggs clearly did not want to be interviewed by the detectives. Reiterating that his review of the videos revealed

> the nature of these interviews was tense, was pressured, but did not amount to a full[-]fledged, what I consider to be an interrogation that may have caused the will of this witness to be broken to a point where she was giving information or providing information to the detectives under stress or under such a duress that I would call it . . . an involuntary statement.

As to the related factor twelve, the judge repeated his prior finding that the circumstances were pressured. He also considered defendant's contention

---

[3] The judge ruled that portion of the statement was inadmissible.

that police offered Suggs $20 if she did not sleep well after telling detectives the truth. During an exchange with one of the detectives, after Suggs told the detective she had not been sleeping well, the detective told her: "And that's what I'm trying to tell you, if you tell us exactly what happened, I guarantee you tonight you['ll] sleep. If not, I'll give you [$]20. She'll probably lie to me, like[, ']I didn't sleep well.['] No, but I'm serious. You'll sleep well." That record evidences that the detective did not offer money in exchange for a statement but offered a bet—rhetorically, or in jest—that she would feel better if she aided their investigation by disclosing what she witnessed.

The judge also considered defendant's contention, mirroring his present argument, that the detectives told Suggs "she was not free to leave" and "[h]er ability to leave was contingent on telling the police what they wanted to hear." In finding Suggs's statements were voluntary, the judge determined

> even [if] the detective's statement may be characterized as that she was not permitted to go home unless she provided statements that they were looking for, that statement, if we follow the detective's statement, was you can go home and we can all go home.
>
> If we take those statements together, it does not imply that you're not going home unless you do what I'm asking you to do.

A-5140-16T1

We see no reason to disturb the judge's evidence-based findings. The context of the conversation does not support defendant's contention she was coerced and pressured. It is evident from the record the detectives believed Suggs was reluctant and withholding information, and they wanted to prolong the interview until she was forthcoming with a complete and truthful account of what she witnessed. When the detective told her she could not leave, he explained:

> Jocelyn, we're close, but not that close. We've got to go to, to the bottom of it. You've got to tell us what went down, so we can finish this, so you can go home and we can go home. All we're doing is trying to catch somebody. . . . You saw what happened. You're basically telling us – most of the stuff you're telling them is stuff that you're hearing from the people that she told, saying this happened . . . that happened. You don't need that because you were there. You saw what happened.
>
> . . . .
>
> As I told you, in five minutes you could have told us, if you went straight to the point what happened, five minutes this conversation would be over. [I]f you would have told us exactly how everything went down when you were there and when you saw what happened.

The detectives did not pressure Suggs to say anything particular, only to tell the truth. And the interview's length was "about three hours"; Suggs was not kept for an inordinate amount of time after that exchange.

12

Although the judge's decision regarding factor eleven seems to have conflated Suggs's motive to fabricate during the interview with her motive during the evidentiary hearing, the judge did find "there is no presence of a motive to fabricate other than her express desire not to be involved, not to testify[.]"  As confirmed by the judge's analysis of factor fifteen, that finding applied to Suggs's mindset during the interview and during the evidentiary hearing, supporting the judge's conclusion that Suggs had no motive to fabricate, and the factor favored a finding of reliability.

The judge found Suggs did not know she was being videotaped and accorded "medium weight in considering the reliability" under factor thirteen. He also left "the inherent believability or lack of believability of the statements" under factor fourteen to the jury, but found the statements reliable under this factor in compliance with our holding in Gross that the trial judge's role "is not to determine the credibility of the out-of-court statement," but "to determine from the proofs whether the prior statement was made or signed under circumstances establishing sufficient reliability that the factfinder may fairly consider it as substantive evidence."  216 N.J. Super. at 110.

As to the fifteenth factor, the judge, in addition to finding Suggs's reluctance to testify was corroborated, determined he was not presented with

13

sufficient evidence "to rule either in favor or against the reliability" of the statements. The State argues Suggs's statements are corroborated by evidence that: defendant's ex-girlfriend, Shadayia McCrae, gave a statement to police indicating she saw defendant on Sixth Street prior to the shooting, in the "[e]arly morning hours" of August 31, 2014, at which time he was carrying "a big grayish colored gun"; police also lifted defendant's fingerprints from the trunk of the BMW; Burroughs's injury was a gunshot wound that penetrated his eye; and Jahmad Green's fingerprints were found on a magazine that was linked by ballistics evidence to the shootings. Inasmuch as the judge did not find these facts from the evidence, we will not consider them.

Although not directly addressed in the judge's analysis, we are not persuaded by defendant's arguments that Suggs's custody was evidenced by the arrest warrant about which the detectives told her when they picked her up in a police vehicle from her place of employment before the second interview, and that the detective's offer to have letters submitted to her employer, and other offers of assistance with employment, coerced her statement, rendering it unreliable. The second statement was only about fifty minutes in length and Suggs was not held after it concluded. And there is no evidence the offers of work-related assistance were an attempt to coerce Suggs's statement. Indeed,

she did not accept the offer. As the trial judge commented after viewing the videos, "although I do not condone everything that . . . occurred in that interview room, do they amount . . . to such an environment where all of the statements that this witness made would be deemed involuntary? I don't reach that conclusion."

"[A] trial court's evidentiary rulings are 'entitled to deference absent a showing of an abuse of discretion[.]'" Harris, 209 N.J. at 439 (alteration in original) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). Accordingly, the trial court's decision to admit evidence should only be overturned if it was "made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. Immigration and Naturalization Serv., 779 F.2d 1260, 1265 (7th Cir. 1985)). Our review of the record fails to provide us with any reason to disturb the trial judge's factual findings, analyses of the Gross factors, or conclusion that Suggs's statements were admissible as substantive evidence under N.J.R.E. 803(a)(1).

We do not agree with the trial judge that the statements were also admissible under N.J.R.E. 803(c)(5). As a threshold, the statement must concern "a matter about which the witness is unable to testify fully and accurately

because of insufficient present recollection[.]"  N.J.R.E. 803(c)(5).  The trial judge found Suggs feigned her inability to recall; hence the statement did not meet the threshold requirement.

## II.

Defendant also argues a detective's expert testimony, presented in the State's case-in-chief, was inadmissible under N.J.R.E. 702 because ballistics evidence based on tool mark analysis is insufficiently reliable.  Defendant bases this argument on three reports—two published by the National Research Council (NRC), and one by the President's Council of Advisors on Science and Technology (PCAST)—as well as several federal opinions.  In the alternative, defendant suggests this court remand for a plenary hearing to determine whether the challenged tool mark evidence meets the Daubert[4] standard of reliability.

The State's expert testified about his analysis of guns, shell casings and projectiles recovered during the shooting investigation and as to tool mark analysis:  the method he used to match the 9mm shell casings to the two handguns that were recovered, and to identify the thirteen .45 caliber shell casings as being fired from the same weapon, which was not recovered.  Specifically, the expert, after analyzing both recovered firearms, as well as the

---

[4]  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

shell casings and projectiles collected from the crime scenes, concluded all thirteen .45 caliber shell casings were fired from the same firearm, the two recovered projectiles could fit into a .45 caliber Glock firearm, six of the 9mm casings recovered were fired from the Glock recovered from the scene, and the remaining two casings found were fired from the recovered Springfield XD handgun.

All three defense counsel stipulated to the detective's qualifications. None of defendants' counsel objected to the testimony, nor did they challenge the expert's methods or findings through cross-examination. As such, the trial record is devoid of any argument, findings or analysis that are usually raised in a pretrial motion challenging an expert's methodology, hampering our review. See State v. Witt, 223 N.J. 409, 419 (2015) (noting parties must raise an issue before the trial court to allow an appellate court to review it); Toll Bros., Inc. v. Twp. of W. Windsor, 173 N.J. 502, 539 (2002) (noting courts should be "reluctant to review matters . . . in any case where a record had not been fully developed by the parties in the trial courts").

In State v.McGuire, 419 N.J. Super. 88, 129 (App. Div. 2011), when considering the defendant's argument "made for the first time on appeal that tool

mark analysis as a discipline is not scientifically reliable," we determined that we did

> not have a factual record to evaluate thoroughly defendant's new argument that expert tool mark analysis should not be admitted at all in our courts. The trial court is not expected "to investigate sua sponte the extent to which the scientific community holds in esteem the particular analytical writing or research that the proponent of testimony advances as foundational to an expert opinion." Hisenaj v. Kuehner, 194 N.J. 6, 16 (2008). If a party opposes expert testimony on the ground that the field has not obtained general acceptance, that party should raise that issue at trial. Ibid.

We reach that same conclusion here.

> [I]t is a well-settled principle that our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.
>
> [Robinson, 200 N.J. at 20 (quoting Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)).]

Because defendant did not object to the expert's testimony at trial, the State was deprived of an opportunity to counter the arguments defendant now advances in his merits brief by proffering testimonial and other evidence. We do not have a developed record of tested theories regarding tool mark identification. And we heed our Supreme Court's caution against reviewing

18

"material not part of the evidentiary record and argument that went beyond that which was advanced before the trial court" in order to determine if the trial court erred in admitting expert testimony. Hisenaj, 194 N.J. at 25.

Further, in McGuire, we upheld the admissibility of tool mark analysis evidence in the context of markings on plastic garbage bags. 419 N.J. Super. at 127-33. We see no reason to change that stance or to deviate from the Court's clear holding that the Frye[5] standard—the same standard we considered in McGuire—is the prevailing standard to be applied in criminal cases. In re Accutane Litig., 234 N.J. 340, 399 (2018).

We thus reject defendant's entreaty to reverse defendant's conviction based on the admission of the expert's testimony, and his demand that the matter be remanded for a plenary hearing on the scientific reliability of that evidence.

### III.

Defendant next contends he was denied a fair trial because a color crime scene photograph depicting Burroughs lying dead in a pool of blood was twice shown to the jury, and because the prosecutor later told the jury in summation that Burroughs "died in a halo, a bloody halo of his own blood." The photo,

---

[5] Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

which apparently was shown on a screen visible to the jury, was identified by two officers who each testified that it depicted Burroughs as they found him at the scene. None of the defense counsel objected when the photo was displayed to the jury during each officer's testimony. Only when the State moved the photo into evidence with numerous other exhibits, did all three defense counsel object. The trial judge ruled the photo inadmissible because the prejudice it engendered outweighed its probative value.

Defendant argues the display of the photo was unduly prejudicial and deprived defendant of a fair trial because it served no purpose other than to inflame the jury's passions. Defendant further contends this error was compounded by the prosecutor's apparent reference during summation to the bloody image depicted in the photograph. According to defendant, these errors were especially prejudicial because of the alleged dearth of evidence, other than the testimony of Suggs, supporting his conviction.

Because no objection was made to the display of the photo, we will not reverse unless the error was "clearly capable of producing an unjust result," R. 2:10-2; that is, unless there is a "reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached," State v. Macon, 57 N.J. 325, 336 (1971). We do not perceive that to be the case.

20

The record reveals the photo was briefly displayed during each officer's testimony before the prosecutor moved on to another exhibit. The first officer testified the photo depicted "the male that we found on the corner who was shot"; and confirmed that the condition of the man in the photo was as the officer found him. When the second officer was shown the photo, he was asked, "Is this what Mr. Burroughs looked like when you arrived at the scene?" He simply responded affirmatively.

During an in-chambers colloquy among counsel and the judge prior to the redirect examination of the first officer, the judge commented, "[w]ith regard to the pictures that were published, . . . my . . . assumption that . . . if I didn't hear any objection, which means you're fine with them. And do me a favor. If there are pictures that are going to be published . . . just make sure you guys are all in agreement." The prosecutor responded that he spoke to defense counsel about the photographs in advance and "told them if you're going to have any objection to publish[ing] them[,] . . . let me know."

We also discern that in the judge's final jury charge, when discussing "the evidence that [the jury] may consider in judging the facts of this case," he told the jury that the term "evidence" included "any exhibits that have been admitted into evidence," and that "any exhibit that has not been admitted into evidence

21

cannot be given to you in the jury room even though it may have been marked for identification. Only those items admitted into evidence can be given to you." The jury is presumed to have followed that instruction. See State v. Loftin, 146 N.J. 295, 390 (1996) ("That the jury will follow the instructions given is presumed.").

Under those circumstances, the brief display of the photo, albeit twice, was not clearly capable of causing an unjust result, leading the jury to an outcome it might not have otherwise reached.

Further, the prosecutor's remarks were untethered to the photograph. Although defendant ascribes the prosecutor's description to the photo, the prosecutor did not mention it. We also note the prosecutor's statement could have been fair comment on the first officer's testimony that, upon arrival at the crime scene, he "saw a male down on the sidewalk bleeding heavily." He described the victim's condition as "laying face up on the sidewalk bleeding from his head." "Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." State v. Frost, 158 N.J. 76, 82 (1999). "Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial." Id. at 83.

We, therefore, find meritless defendant's contention that he was deprived of a fair trial because the photo was twice displayed.

IV.

Defendant was sentenced to a twenty-year prison term, subject to an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, for the lesser-included offense of aggravated manslaughter; a seven-year concurrent term for unlawful possession of a weapon; and a consecutive seven-year sentence, also subject to a NERA parole ineligibility period, for aggravated assault.

The trial judge applied aggravating factors one, three, six and nine, N.J.S.A. 2C:44-1(a)(1), (3), (6) and (9), to all counts, and applied aggravating factor two, N.J.S.A. 2C:44-1(a)(2), separately, to the aggravated assault charge.[6]

The court attributed "medium weight" to aggravating factor one, "[t]he nature and circumstances of the offense," N.J.S.A. 2C:44-1(a)(1), noting the shots were fired at a moving target—the Taurus—in the dark in a residential neighborhood, where numerous young people congregated. The judge also

---

[6]  Although the judge included aggravating factor five in the order for commitment, his oral sentencing decision makes clear that he did not intend its application. "[W]here there is a conflict between the oral sentence and the written commitment, the former will control if clearly stated and adequately shown[.]" State v. Pohlabel, 40 N.J. Super. 416, 423 (App. Div. 1956).

noted: "the higher the degree of the crime," in this case, the first- and the second- degree, "the greater the . . . public need for protection [of the public], and the more the need for deterrence [of others]." The judge concluded: "[t]he senseless nature of the shootings and the fact that . . . defendant fled the scene . . . leads this [c]ourt to find that the aggravated manslaughter and the aggravated assault were committed in a depraved manner."

With respect to the aggravated assault of Chambers, the court attributed "somewhat low weight" to aggravating factor two, "[t]he gravity and seriousness of harm inflicted on the victim," N.J.S.A. 2C:44-1(a)(2), due to the severity of the injury she suffered.

The judge gave "medium weight" to aggravating factor three, "[t]he risk that the defendant will commit another offense," N.J.S.A. 2C:44-1(a)(3), recognizing defendant had accumulated a criminal record consisting of two prior arrests, two municipal court convictions, fifteen juvenile "incidents," and a separate pending homicide charge. The judge also considered defendant's numerous probation violations, his lack of employment history, and his demeanor when questions were addressed to him. Regarding the latter point, the judge commented:

> [W]hen comments were addressed to him, it is my – I'm
> not a doctor, [defendant]. But you were unable to take

those comments and respond to them in a way that I would consider would have been appropriate. Instead, you were too quick to respond. I understand sometimes there are circumstances that are beyond you, but that to me is a risk that you may have to consider heartily because – work on it while you are going to be incarcerated because this is something that could get you involved in a number of instances whether in or out.

The judge noted various witnesses mentioned defendant's affiliation with a local street gang;[7] but acknowledged: "I do not have any independent or substantial evidence as to the extent of [defendant's] involvement in that particular group." Accordingly, the judge gave "minimum to low weight" to defendant's gang affiliation in his analysis of aggravating factor three.

Defendant argues the judge, in analyzing aggravating factor one, improperly relied on the degree of the crimes, and double-counted recklessness, which is an element of aggravated manslaughter; and improperly relied on the fact defendant fled the scene which, according to defendant, is commonplace and not especially heinous, cruel, or depraved. Defendant further argues the crimes were not especially cruel, insofar as defendant did not intentionally inflict pain or suffering upon the victims. Regarding factor two, defendant

---

[7] A pretrial ruling barred the prosecutor from mentioning defendant's gang affiliation at trial.

contends the sentencing court again impermissibly double-counted because the severity of the injury constitutes an element of aggravated assault and already factored into the grading of the charge. Defendant also argues the sentencing judge improperly relied on his perception of defendant's responses to the court, as well as on unsubstantiated allegations of gang involvement, when weighing aggravating factor three. Specifically, defendant notes the sentencing court conceded the lack of independent or substantial evidence of defendant's gang affiliation. Consequently, defendant argues there was no credible evidence on which to base those findings.

Applying a deferential standard of review to the judge's sentencing determination, we find no error in the judge's identification and balance of the "aggravating and mitigating factors that are supported by competent credible evidence in the record." State v. Grate, 220 N.J. 317, 337 (2015) (quoting State v. Lawless, 214 N.J. 594, 606 (2013)).

Recognizing the judge's application of aggravating factor one "must be based on factors other than the death of the victim and the circumstances essential to support a finding that the defendant has acted with extreme indifference to human life," State v. Fuentes, 217 N.J. 57, 76 (2014), we conclude the judge properly analyzed facts that went beyond the essential

elements of the crime. Multiple shots were fired in the dark at a moving target in a residential neighborhood in an area populated by numerous bystanders. This combination of facts transcends the requisite basis for reckless indifference and buttresses the application of aggravating factor one. Defendant placed numerous people at risk of bodily injury or death by wantonly and repeatedly firing. See Lawless, 214 N.J. at 609-10 ("[C]ourts applying aggravating factor one focus on the gravity of the defendant's conduct, considering both its impact on its immediate victim and the overall circumstances surrounding the criminal event.").

We also reject defendant's argument that the judge impermissibly relied on the grading of the crimes in applying factor one. The judge simply quoted the relevant case law that framed his analysis:

> [T]he paramount reason that is provided that the [c]ourt focused on is the severity of the crimes is to ensure the protection of the pub[l]ic and the deterrence to others. Thus, the higher the degree of the crime, the greater the . . . public need for protection, and the more the need for deterrence.

See Fuentes, 217 N.J. at 74 (quoting State v. Megargel, 143 N.J. 484, 500 (1996)) ("[T]he paramount reason we focus on the severity of the crime is to assure the protection of the public and the deterrence of others. The higher the

degree of the crime, the greater the public need for protection and the more need for deterrence.").

Finally, in applying aggravating factor one, the sentencing judge properly considered that defendant fled the scene. Although criminal defendants may routinely flee the scene of their crimes, in this case it is noteworthy defendant fled without rendering or calling for aid, leaving Chambers, his codefendant's girlfriend and unintended victim, struggling for life. The judge did not err in according "medium weight" to factor one.

We determine the remainder of defendant's sentencing arguments to be without sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(2). We briefly note the low weight the judge attributed to aggravating factor two was warranted by the severity of Chambers's injuries that more than surpassed the statutory element of "serious bodily injury." N.J.S.A. 2C:11-1(b) (defining serious bodily injury as an injury "which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ"); see also State v. Mara, 253 N.J. Super. 204, 214 (App. Div. 1992) ("The extent of the injuries, which exceed the statutory minimum for the offense, may be considered as aggravating."). And, although the judge credited the testimony of several witnesses in finding

defendant's gang affiliation, see State v. Smith, 262 N.J. Super. 487, 530 (App. Div. 1993) ("sentencing judges may consider material that otherwise would not be admissible at trial, as long as it is relevant and trustworthy"), the judge attributed only "minimum to low weight" to that affiliation because there was no evidence establishing the extent of his involvement. Moreover, defendant's lengthy record alone warranted the "medium weight" the judge attributed to aggravating factor three.

Finally, the judge properly applied the Yarbough[8] factors in imposing a consecutive sentence for the aggravated assault of Chambers. As the judge

---

[8]  In Yarbough, 100 N.J. at 644, the Court delineated factors upon which a sentencing court should focus in determining whether a sentence should run concurrent or consecutive:

> (a) the crimes and their objectives were predominantly independent of each other;
>
> (b) the crimes involved separate acts of violence or threats of violence;
>
> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>
> (d) any of the crimes involved multiple victims;
>
> (e) the convictions for which the sentences are to be imposed are numerous.

noted, Burroughs and Chambers were in "two separate locations" when they were shot; Chambers was seated inside the BMW, and Burroughs was shot "on the sidewalk some ways away." Accordingly, the judge concluded, "[t]o issue concurrent sentences as the defense is proposing would not adequately take into account the [distinct] nature of the two harms inflicted by this defendant."

"[A] trial court has the discretion to impose consecutive sentences in cases where . . . the only factor supporting consecutive sentencing is multiple victims." State v. Molina, 168 N.J. 436, 442 (2001). "Although that principle resonates most clearly in cases in which a perpetrator intentionally targets multiple victims . . . it also applies to cases in which, as here, the defendant does not intend to harm multiple victims but it is foreseeable that his or her reckless conduct will result in multiple victims." State v. Carey, 168 N.J. 413, 429 (2001).

We perceive no violation of the sentencing guidelines; the aggravating and mitigating factors found by the judge were based upon credible evidence in the record; and the sentence imposed for these multiple crimes is not "clearly unreasonable so as to shock the judicial conscience." Fuentes, 217 N.J. at 70 (quoting State v. Roth, 95 N.J. 334, 365 (1984)).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5140-16T1